**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

FILED NOVEMBER 18, 2011

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* REQUEST FOR ADVISORY
OPINION REGARDING
CONSTITUTIONALITY OF 2011 PA 38        No. 143157

BEFORE THE ENTIRE BENCH

MARKMAN, J.

Pursuant to Const 1963, art 3, § 8, this Court granted the Governor's request for an advisory opinion on the constitutionality of 2011 PA 38.[1]  More specifically, we granted the Governor's request to address the following four constitutional questions:

> (1) whether reducing or eliminating the statutory exemption for public-pension incomes as described in MCL 206.30, as amended, impairs accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24; (2) whether reducing or eliminating the statutory tax exemption for pension incomes, as described in MCL 206.30, as amended, impairs a contract obligation in violation of Const 1963, art 1, § 10 or US Const, art I, § 10(1); (3) whether determining eligibility for income-tax exemptions on the basis of total household resources, or age and total household resources, as

---

[1] Const 1963, art 3, § 8 provides, "Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date."

described in MCL 206.30(7) and (9), as amended, creates a graduated income tax in violation of Const 1963, art 9, § 7; and (4) whether determining eligibility for income-tax exemptions on the basis of date of birth, as described in MCL 206.30(9), as amended, violates equal protection of the law under Const 1963, art 1, § 2 or the Fourteenth Amendment of the United States Constitution. [*In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 489 Mich 954 (2011).]

We answer all these questions, with the exception of whether 2011 PA 38 creates a graduated income tax, in the negative. That is, we hold that:

- Reducing or eliminating the statutory exemption for public-pension incomes as set forth in MCL 206.30[2] *does not* impair accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24; and

- Reducing or eliminating the statutory tax exemption for pension incomes as set forth in MCL 206.30 *does not* impair a contractual obligation in violation of Const 1963, art 1, § 10 or US Const, art I, § 10(1).

And we hold unanimously that:

- Determining eligibility for income-tax exemptions on the basis of date of birth as set forth in MCL 206.30(9) *does not* violate the equal protection of the law under Const 1963, art 1, § 2 or the Fourteenth Amendment of the United States Constitution; and

---

[2] Unless otherwise specified, all references to MCL 206.30 are to that provision as amended by 2011 PA 38.

- Determining eligibility for income-tax exemptions and deductions on the basis of total household resources as set forth in MCL 206.30(7) and (9) *does* create a graduated income tax in violation of Const 1963, art 9, § 7.

Finally, we hold that:

- Pursuant to MCL 8.5, the unconstitutional portions of 2011 PA 38 can reasonably be severed from the remainder of the act, which is constitutional with respect to all the issues raised.

Although Justice HATHAWAY agrees that those portions of the statutes that we sever ought to be struck down because they are unconstitutional, she nevertheless asserts that we are "judicially creating tax deductions and exemptions for individuals earning more than $75,000 annually . . . ." *Post* at 2. This is an odd assertion, given that she too would "create tax deductions and exemptions for individuals earning more than $75,000" by striking down the amendments of these provisions in their entirety and thereby returning the law to its pre-2011 PA 38 status, in which taxpayers earning more than $75,000 received these same deductions and exemptions.

We emphasize that the questions before us are all constitutional questions. This Court is not deciding whether 2011 PA 38 represents wise or unwise, prudent or imprudent public policy, only whether 2011 PA 38 is consistent with the constitutions of the United States and Michigan.

## I. BACKGROUND

On May 25, 2011, the Governor signed into law Enrolled House Bill 4361, which became 2011 PA 38. The particular provisions at issue here are MCL 206.30(7) and

3

MCL 206.30(9) of the Income Tax Act,[3] which will take effect January 1, 2012. MCL

206.30(7) provides in pertinent part:

> For a taxpayer whose total household resources[4] are $75,000.00 or more for a single return or $150,000.00 or more for a joint return, the personal exemption allowed under [MCL 206.30(2)] [5] shall be adjusted by multiplying the exemption for the tax year for a single return by a fraction, the numerator of which is $100,000.00 minus the taxpayer's total household resources, and the denominator of which is $25,000.00, and for a joint return by a fraction, the numerator of which is $200,000.00 minus the taxpayer's total household resources, and the denominator of which is $50,000.00. The personal exemption allowed under [MCL 206.30(2)] shall not be allowed for a single taxpayer whose total household resources exceed $100,000.00 or for joint filers whose total household resources exceed $200,000.00.

MCL 206.30(9) provides:

> In determining taxable income under this section, the following limitations and restrictions apply:

> (a) For a person born before 1946, this subsection provides no additional restrictions or limitations under [MCL 206.30(1)(f)].

---

[3] MCL 206.1 *et seq.*

[4] Under 2011 PA 38, the term "total household resources" is defined as

> all income received by all persons of a household in a tax year while members of a household, plus any net business loss after netting all business income and loss, plus any net rental or royalty loss, plus any deduction from federal adjusted gross income for a carryback or carryforward of a net operating loss as defined in [26 USC 172(b)(2)]. [MCL 206.508(4).]

[5] MCL 206.30(2) provides, "Except as otherwise provided in [MCL 206.30(7)], a personal exemption of $3,700.00 multiplied by the number of personal or dependency exemptions allowable on the taxpayer's federal income tax return pursuant to the internal revenue code shall be subtracted in the calculation that determines taxable income."

(b) For a person born in 1946 through 1952, the sum of the deductions under [MCL 206.30(1)(f)(*i*), (*ii*), and (*iv*)][6] is limited to $20,000.00 for a single return and $40,000.00 for a joint return. After that person reaches the age of 67, the deductions under [MCL 206.30(1)(f)(*i*), (*ii*), and (*iv*)] do not apply and that person is eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return, which deduction is available against all types of income and is not restricted to income from retirement or pension benefits. However if that person's total household resources exceed $75,000.00 for a single return or $150,000.00 for a joint return, that person is not eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return. A person that takes the

---

[6] MCL 206.30(1)(f) provides, in pertinent part:

Deduct the following to the extent included in adjusted gross income subject to the limitations and restrictions set forth in [MCL 206.30(9)]:

(*i*) Retirement or pension benefits received from a federal public retirement system or from a public retirement system of or created by this state or a political subdivision of this state.

(*ii*) Retirement or pension benefits received from a public retirement system of or created by another state or any of its political subdivisions if the income tax laws of the other state permit a similar deduction or exemption or a reciprocal deduction or exemption of a retirement or pension benefit received from a public retirement system of or created by this state or any of the political subdivisions of this state.

* * *

(*iv*) Beginning on and after January 1, 2007, retirement or pension benefits not deductible under [MCL 206.30(1)(f)(*i*)] or [MCL 206.30(1)(e)] from any other retirement or pension system or benefits from a retirement annuity policy in which payments are made for life to a senior citizen, to a maximum of $42,240.00 for a single return and $84,480.00 for a joint return. The maximum amounts allowed under this subparagraph shall be reduced by the amount of the deduction for retirement or pension benefits claimed under [MCL 206.30(1)(f)(*i*)] or [MCL 206.30(1)(e)] and by the amount of a deduction claimed under [MCL 206.30(1)(p)]. For the 2008 tax year and each tax year after 2008, the maximum amounts allowed under this subparagraph shall be adjusted by the percentage increase in the United States consumer price index for the immediately preceding calendar year. The department shall annualize the amounts provided in this subparagraph as necessary. As used in this subparagraph, "senior citizen" means that term as defined in [MCL 206.514].

5

deduction under [MCL 206.30(1)(e)][7] is not eligible for the unrestricted deduction of $20,000.00 for a single return and $40,000.00 for a joint return under this subdivision.

(c) For a person born after 1952, the deduction under [MCL 206.30(1)(f)(*i*), (*ii*), or (*iv*)] does not apply. When that person reaches the age of 67, that person is eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return, which deduction is available against all types of income and is not restricted to income from retirement or pension benefits. If a person takes the deduction of $20,000.00 for a single return and $40,000.00 for a joint return, that person shall not take the deduction under [MCL 206.30(1)(f)(*iii*)][8] and shall not take the personal exemption under [MCL 206.30(2)]. That person may elect not to take the deduction of $20,000.00 for a single return and $40,000.00 for a joint return and elect to take the deduction under [MCL 206.30(1)(f)(*iii*)] and the personal exemption under [MCL 206.30(2)] if that election would reduce that person's tax liability. However, if that person's total household resources exceed $75,000.00 for a single return or $150,000.00 for a joint return, that person is not eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return. A person that takes the deduction under [MCL 206.30(1)(e)] is not eligible for the unrestricted deduction of $20,000.00 for a single return and $40,000.00 for a joint return under this subdivision.

(d) For a joint return, the limitations and restrictions in this subsection shall be applied based on the age of the older spouse filing the joint return.

---

[7] MCL 206.30(1)(e) provides:

Deduct, to the extent included in adjusted gross income, the following:

(*i*) Compensation, including retirement benefits, received for services in the armed forces of the United States.

(*ii*) Retirement or pension benefits under the railroad retirement act of 1974, 45 USC 231 to 231v.

[8] MCL 206.30(1)(f)(*iii*) allows a deduction for "[s]ocial security benefits as defined in [26 USC 86]."

Before the enactment of 2011 PA 38, public-pension benefits were completely deductible,[9] private-pension benefits were deductible up to $42,240 for a single return and $84,480 for a joint return (subject to annual inflation adjustments), and all taxpayers were entitled to a personal exemption of $2,500 (subject to annual inflation adjustments). See MCL 206.30(1)(f), (2), and (7), as amended by 2009 PA 134. Pursuant to 2011 PA 38, however, not all public pensions are deductible, not all private pensions are deductible up to $42,240 or $84,480, and not all taxpayers are entitled to a personal exemption. MCL 206.30(7) and (9). Instead, only those taxpayers whose total household resources are less than $75,000 for a single return or $150,000 for a joint return are entitled to the entire personal exemption (which is now $3,700),[10] while those taxpayers whose total household resources are between $75,000 and $100,000 for a single return or $150,000 and $200,000 for a joint return are entitled to a portion of this personal

[9] All public-pension benefits were completely deductible under the Income Tax Act. In addition, the State Employees' Retirement Act, MCL 38.40, the Public School Employees Retirement Act, MCL 38.1346(1), the Michigan Legislative Retirement System Act, MCL 38.1057(1), the city library employees' retirement system act, MCL 38.705, and the Judges Retirement Act, MCL 38.2670(1), exempted certain public-pension benefits from taxation. All these acts were amended to remove the statutory exemption from state taxes consistently with 2011 PA 38. See 2011 PA 41, 2011 PA 42, 2011 PA 43, 2011 PA 44, and 2011 PA 45. Although the Governor's request and our order in this case referred explicitly only to 2011 PA 38, because Public Acts 41 through 45 of 2011 are inextricably linked to the issues raised in this case, we make clear that we have considered these statutory amendments when reviewing the issues in this case, and our holding takes into account whatever effect each of these provisions may have on the issues raised. Citing this footnote, Justice CAVANAGH asserts that this opinion "sweeps far too wide in attempting to foreclose the myriad possible challenges premised on individual factual circumstances." *Post* at 9. However, we refer to these other provisions only because they are relevant to the question before us: whether reducing or eliminating the statutory tax exemption for public-pension incomes impairs the accrued financial benefits of a public-pension plan.

[10] MCL 206.30(2).

exemption, and those taxpayers whose total household resources exceed $100,000 for a single return or $200,000 for a joint return are not entitled to any portion of the personal exemption. MCL 206.30(7).

In addition, while 2011 PA 38 does not affect the available pension deductions of those people born before 1946, it does affect the pension deductions of those people born in 1946 and thereafter. MCL 206.30(9). For those people born on or after January 1, 1946 and not after December 31, 1952, public and private pensions are subject to the same deductions up to $20,000 for a single return and $40,000 for a joint return. MCL 206.30(9)(b). And, upon reaching the age of 67, although the pension deductions are no longer available, a general deduction[11] is available for those people up to $20,000 for a single return and $40,000 for a joint return as long as the taxpayer's total household resources do not exceed $75,000 for a single return or $150,000 for a joint return. *Id.* Finally, for those people born after December 31, 1952, although the pension deductions are no longer available, upon reaching the age of 67, a general deduction is available up to $20,000 for a single return and $40,000 for a joint return as long as the taxpayer's total household resources do not exceed $75,000 for a single return or $150,000 for a joint return. MCL 206.30(9)(c). However, if a taxpayer takes the general deduction, he or she cannot take the deduction for social security benefits or the personal exemption. *Id.*

The Governor, in a letter dated May 31, 2011, requested an advisory opinion regarding the constitutionality of 2011 PA 38. On June 15, 2011, we granted this request,

---

[11] A general deduction is a deduction that is "available against all types of income and is not restricted to income from retirement or pension benefits." MCL 206.30(9)(b).

invited the Attorney General to submit briefs and argue as both opponent and proponent of the matters at issue, invited other interested parties to file briefs amicus curiae, and, on September 7, 2011, heard oral arguments.[12]

## II. STANDARDS

"Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004). "'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.'" *Id.* at 423, quoting *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with the party challenging it," *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007), in this case the opposing Attorney General. "[W]hen considering a claim that a statute is unconstitutional, the Court does not inquire into the wisdom of the legislation." *Taylor*, 468 Mich at 6.

---

[12] To avoid confusion, the terms "supporting Attorney General" and "opposing Attorney General" will be used throughout this opinion to identify the briefs and argument submitted by the Attorney General as the proponent and opponent, respectively, of the constitutionality of 2011 PA 38.

"The presumption of constitutionality is especially strong with respect to taxing statutes." *Caterpillar, Inc v Dep't of Treasury*, 440 Mich 400, 413; 488 NW2d 182 (1992). "State legislatures have great discretionary latitude in formulating taxes." *Id.* "'The legislature must determine all questions of State necessity, discretion or policy in ordering a tax and in apportioning it. 1 Cooley, Taxation (4th ed), § 67. And the judicial tribunals of the State have no concern with the policy of State taxation determined by the legislature. 1 Cooley, Taxation (4th ed), § 67.'" *Id.* at 414, quoting *C F Smith Co v Fitzgerald*, 270 Mich 659, 670; 259 NW 352 (1935). Therefore, "[a] taxing statute must be shown to clearly and palpably violate[] the fundamental law before it will be declared unconstitutional." *Caterpillar*, 440 Mich at 415, quoting *O'Reilly v Wayne Co*, 116 Mich App 582, 592; 323 NW2d 493 (1982) (citations and quotation marks omitted; alteration in *O'Reilly*).

"'When reviewing constitutional provisions, the objective of such review is to effectuate the intent of the people who adopted the constitution.'" *Straus v Governor*, 459 Mich 526, 533; 592 NW2d 53 (1999), quoting *Straus v Governor*, 230 Mich App 222, 228; 583 NW2d 520 (1998). "'The lodestar principle is that of "common understanding," the sense of the words used that would have been most obvious to those who voted to adopt the constitution.'" *Id.* "'Both sides have cited portions of the "Address to the People" and the record of the Constitutional Convention, both of which may properly be considered in interpreting constitutional provisions.'" *Straus*, 495 Mich at 533, quoting *Straus*, 230 Mich App at 228 n 2.[13] However, it must be remembered that

---

[13] While on more than one occasion this Court has explained why it does not find all forms of legislative history to be useful tools in the interpretative process, see, e.g., *In re*

10

although this Court has continually recognized that constitutional convention debates are relevant to determining the meaning of a particular provision, . . . the proper objective in consulting constitutional convention debates is not to discern the intent of the framers in proposing or supporting a specific provision, but to determine the intent of the ratifiers in adopting the provision . . . .

\* \* \*

Bearing this principle in mind, the primary focus . . . should not [be] on the intentions of the delegates . . . but, rather, on any statements they may have made that would have shed light on why they chose to employ the particular terms they used in drafting the provision to aid in discerning what the common understanding of those terms would have been when the provision was ratified by the *people*. [*Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 655-657; 698 NW2d 350 (2005) (citations omitted; emphasis added).]

---

*Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003), this Court has consistently held that the Address to the People and the constitutional convention debates may be highly relevant in determining the meaning of particular constitutional provisions to the *ratifiers*, see, e.g., *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 655-656; 698 NW2d 350 (2005). The Address is particularly important in this regard because it represents what the ratifiers, the people, were told about the proposed constitution *before* they voted to adopt it. See *People v Nutt*, 469 Mich 565, 590 n 26; 677 NW2d 1 (2004) ("The Address to the People, widely distributed to the public prior to the ratification vote in order to explain the import of the . . . proposals, 'is a valuable tool . . . .'") (citation omitted). Moreover, unlike other forms of legislative history, such as "legislative analyses" created within the legislative branch by staff persons, the Address was "officially approved by the members of the constitutional convention . . . ." *Mich United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 378; 630 NW2d 297 (2001) (YOUNG, J., concurring). Finally, the Address represents the best statement of the convention as a *whole*, as a collective body, rather than merely the statements of individual convention delegates. Nonetheless, we believe that even the latter has greater value in supplying evidence of the intended meaning of constitutional provisions, which of necessity tend to be broad and general expressions of policy, than do the statements of individual legislators with regard to statutes, which tend to be more specific and limited expressions of policy.

III. ANALYSIS

A. ACCRUED FINANCIAL BENEFIT

The first issue contained in the Governor's request for an advisory opinion concerns whether reducing or eliminating the statutory exemption for public-pension incomes as set forth in MCL 206.30 impairs accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24. The first clause of Const 1963, art 9, § 24 provides, "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Before § 24 was adopted, "[i]t had long been the general rule that pensions granted by public authorities were not contractual obligations but gratuitous allowances which could be revoked at will by the authority because the pensioner was not deemed to have had any vested right in their continuation." *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659, 662; 209 NW2d 200 (1973).[14] The obvious intent of § 24, however, was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished. As explained by Delegate Richard Van Dusen, who served on the Finance and Taxation Committee and was the chairman of the Rules and Resolutions Committee, at the Constitutional Convention of 1961-1962,

---

[14] See, e.g., *Brown v Highland Park*, 320 Mich 108, 114; 30 NW2d 798 (1948) ("We are convinced that the majority of cases in other jurisdictions establishes the rule that a pension granted by public authorities is not a contractual obligation, that the pensioner has no vested right, and that a pension is terminable at the will of a municipality, at least while acting within reasonable limits.").

[§ 24] is designed to . . . give to the employees participating in these plans a security which they do not now enjoy, by making the accrued financial benefits of the plans contractual rights. This, you might think, would go without saying, but several judicial determinations have been made to the effect that participants in pension plans for public employees have no vested interest in the benefits which they believe they have earned; that the municipalities and the state authorities which provide these plans provide them as a gratuity, and therefore it is within the province of the municipality or the other public employer to terminate the plan at will without regard to the benefits which have been, in the judgment of the employees, earned.

Now, it is the belief of the committee that the benefits of pension plans are in a sense deferred compensation for work performed. And with respect to work performed, it is the opinion of the committee that the public employee should have a contractual right to benefits of the pension plan, which should not be diminished by the employing unit after the service has been performed. [1 Official Record, Constitutional Convention 1961, pp 770-771, quoted with approval in *Advisory Opinion*, 389 Mich at 663.]

Const 1963, art 9, § 24, however, says nothing about whether these pension benefits can be taxed. And given the broad authority to tax granted to the Legislature by Const 1963, art 9, § 1[15] and the specific constitutional prohibition against "surrender[ing],

---

[15] Const 1963, art 9, § 1 provides, "The legislature shall impose taxes sufficient with other resources to pay the expenses of state government." See also *Civil Serv Comm v Auditor General*, 302 Mich 673, 682-683; 5 NW2d 536 (1942), in which this Court explained:

[T]he control of the purse strings of government is a legislative function. Indeed, it is the supreme legislative prerogative, indispensable to the independence and integrity of the legislature, and not to be surrendered or abridged, save by the Constitution itself, without disturbing the balance of the system and endangering the liberties of the people. The right of the legislature to control the public treasury, to determine the sources from which the public revenues shall be derived and the objects upon which they shall be expended, to dictate the time, the manner, and the means both of their collection and disbursement, is firmly and inexpugnably established in our political system. This supreme prerogative of the legislature, called in question by Charles I, was the issue upon which Parliament went to war with the king, with the result that ultimately the absolute control of

13

suspend[ing] or contract[ing] away" this authority, Const 1963, art 9, § 2,[16] a limitation on the Legislature's authority to tax pensions cannot reasonably be read into Const 1963, art 9, § 24. If the ratifiers of the Constitution had intended to limit the Legislature's authority to tax pensions in the same manner as all other forms of income, they would have expressly said so in § 24. See *Shivel v Kent Co Treasurer*, 295 Mich 10, 15; 294 NW 78 (1940) ("The power to levy taxes for governmental needs is in the legislature subject only to limitations and regulations found in the Constitution."). That the ratifiers knew how to do so had they so intended is clearly evidenced by the fact that they did, in fact, expressly limit the Legislature's authority to tax nonprofit religious or educational organizations in Const 1963, art 9, § 4[17] and the sale of prescription drugs and food in Const 1963, art 9, § 8.[18]

---

Parliament over the public treasury was forever vindicated as a fundamental principle of the British Constitution. The American commonwealths have fallen heirs to this great principle, and the prerogative in question passes to their legislatures without restriction or diminution, except as provided by their Constitutions, by the simple grant of the legislative power. [Citations and quotation marks omitted.]

[16] Const 1963, art 9, § 2 provides, "The power of taxation shall never be surrendered, suspended or contracted away."

[17] Const 1963, art 9, § 4 provides, "Property owned and occupied by non-profit religious or educational organizations and used exclusively for religious or educational purposes, as defined by law, shall be exempt from real and personal property taxes."

[18] Const 1963, art 9, § 8 provides, in pertinent part:

No sales tax or use tax shall be charged or collected from and after January 1, 1975 on the sale or use of prescription drugs for human use, or on the sale or use of food for human consumption except in the case of prepared food intended for immediate consumption as defined by law.

Again, Const 1963, art 9, § 24 provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." A tax exemption is not an "accrued financial benefit" of a pension plan. "Accrue" means "'to increase, grow,'" "'to come into existence as an enforceable claim,'" to "'vest as a right,'" "'to come by way of increase or addition: arise as a growth or result,'" "'to be periodically accumulated in the process of time,'" to "'gather, collect, accumulate,'" "'to happen or result as a natural growth,'" to "'arise in due course,'" to "'come or fall as an addition or increment,'" and "to become a present and enforceable right or demand." *Studier*, 472 Mich at 653, quoting *Webster's Third New Int'l Dictionary* (1961), p 13 and *Random House American College Dictionary* (1964), p 9. See also *Random House Webster's College Dictionary* (1991) (defining "accrue" as "to happen or result as a natural growth, addition," "to be added as a matter of periodic gain or advantage, as interest on money," and "to accumulate or earn over time").[19]

> Thus, according to these definitions, the ratifiers of our Constitution would have commonly understood "accrued" benefits to be benefits of the type that increase or grow over time—such as a pension payment or

---

[19] Justice CAVANAGH "do[es] not see how these definitions mandate that the benefit must 'increase or grow over time.'" *Post* at 4. Once again, these definitions of "accrue" include "'to increase, grow,'" "'arise as a growth or result,'" "'to be periodically accumulated in the process of time,'" to "'gather, collect, accumulate,'" "'to happen or result as a natural growth,'" to "'arise in due course,'" to "'come or fall as an addition or increment,'" *Studier*, 472 Mich at 653, quoting *Webster's Third New Int'l Dictionary* (1961), p 13, and *Random House American College Dictionary* (1964), p 9, "to be added as a matter of periodic gain or advantage, as interest on money," and "to accumulate or earn over time," *Random House Webster's College Dictionary* (1991). Given these definitions, we do not see how *Studier*'s holding that an accrued benefit is a benefit that "increase[s] or grow[s] over time" can be seriously contested.

retirement allowance that increases in amount along with the number of years of service a public school employee has completed.[20] [*Studier*, 472 Mich at 654.][21]

A pension-tax exemption is not an "accrued" benefit because it does not "grow over time." During a state employee's working years, his or her pension-tax exemption, as opposed to the pension itself, cannot be said to be growing or accumulating because it does not even "come into existence" or "vest" until after the employee has retired and begins to collect his or her pension benefits. That is, one does not have a right to a tax exemption until one has received the funds that are subject to the exemption. Absent those funds, there is no tax exemption. And once a retiree has begun to receive his or her pension benefits, the tax exemption itself still does not "grow over time," but remains fixed. Therefore, a tax exemption is not an "accrued financial benefit."[22]

The second clause of Const 1963, art 9, § 24 states, "Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." This clause confirms that a tax exemption is not an "accrued financial benefit" protected by § 24

---

[20] See also *Kosa v State Treasurer*, 408 Mich 356, 370-371; 292 NW2d 452 (1980) ("The term 'accrued financial benefits' was defined by this Court in *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659, 662-663; 209 NW2d 200 [1973], as the right to receive certain pension payments upon retirement, based upon service performed.").

[21] In *Studier*, this Court held that health-care benefits are not "accrued financial benefits" because they do not "grow over time." *Studier*, 472 Mich at 654.

[22] In concluding that the "tax exemption *does* 'increase or grow over time,'" *post* at 6 (emphasis in the original), Justice CAVANAGH fails to recognize that this exemption does not even come into being until the employee retires and begins to collect his or her pension benefits.

because it would be impossible to fund a tax exemption, as opposed once again to the pension itself, in the year that the service was rendered in light of the fact that an exemption's value is entirely a function of the tax rate of the taxpayer at the time that the exemption is actually taken-- something that obviously cannot be known at the time the services themselves are rendered.[23]

Finally, the constitutional convention debates reinforce this conclusion. As this Court explained in *Studier*, 472 Mich at 657:

> "The only explicit elaboration on the term 'accrued financial benefits' was this remark by delegate Van Dusen:
>
> "'[T]he words "accrued financial benefits" were used designedly, so that the contractual right of the employee would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits.'" [*Id.*, quoting *Musselman v Governor*, 448 Mich 503, 510 n 8; 533 NW2d 237 (1995), quoting 1 Official Record, Constitutional Convention 1961, pp 773-774.][24]

---

[23] Justice CAVANAGH inconsistently argues that a tax exemption *does* constitute an "accrued financial benefit" for purposes of the first clause of article 9, § 24 and therefore cannot be impaired, but that a tax exemption does *not* constitute a "financial benefit" for purposes of the second clause of article 9, § 24 and therefore need not be annually funded.

[24] In addition, Van Dusen stated:

> It is not intended that an individual employee should, as a result of this language, be given the right to sue the employing unit to require the actuarial funding of past service benefits, or anything of that nature. What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them. [1 Official Record, Constitutional Convention 1961, p 774.]

Thus, although there was much discussion at the constitutional convention of creating a contractual right to receive pension benefits, there was absolutely no discussion of

17

The "deferred compensation" protected as a "contractual obligation" by § 24 is the pension payments themselves earned by the retiree, while the tax exemption is something distinct and is not the subject of § 24.[25] The tax exemption is simply a postdistribution effect of the accrued financial benefits that have otherwise been paid in full. As the Ohio Supreme Court explained in upholding the validity of Ohio's decision to eliminate a public-employee-pension-tax exemption, "there is a definite legal distinction between reducing the rate of a pension and levying a tax upon the income received from that pension." *Herrick v Lindley*, 59 Ohio St 2d 22; 391 NE2d 729, 733 (1979). That is, "there is a distinction between the right to receive retirement benefits unfettered by subsequent reductions in the rate of those benefits and the right to a permanent tax exemption." *Id.*[26] That there is a distinction between the right to receive retirement

creating a contractual right to tax-free pension benefits. It would seem that if the delegates had intended to create the latter right, they would at least have mentioned this in passing, particularly in light of the general proposition established in their new constitution against "surrender[ing], suspend[ing] or contract[ing] away" the Legislature's taxing authority. Const 1963, art 9, § 2. Even more telling is the lack of any reference to a contractual right to tax-free pension benefits in the Address to the People. Given that neither the actual language of § 24 nor the Address to the People mentions such a right, the ratifiers would have had absolutely no reason to suppose that, by adopting § 24, they would be creating a contractual right to tax-free pension benefits.

[25] Chairman Van Dusen also stated that § 24 "was simply designed to put pension benefits earned in public service on the same basis as deferred compensation earned in private employment." 1 Official Record, Constitutional Convention 1961, p 773. Given that the Legislature is not prohibited from taxing deferred compensation earned in private employment, "put[ting] pension benefits earned in public service on the same basis as deferred compensation earned in private employment" would require that there likewise be no prohibition of the Legislature's taxing pension benefits earned in public service.

[26] See also *Spradling v Colorado Dep't of Revenue*, 870 P2d 521, 524 (Colo App, 1994) ("Because [the statute] does not reduce the amount of the pension benefits to which plaintiffs are contractually entitled, and because there is no contractual right to an income tax exemption for such benefits, we hold that the statute is not constitutionally invalid insofar as it subjects those benefits to state income tax.").

18

benefits and the right to a tax exemption is illustrated by the fact that a retiree who moves out of Michigan is still entitled to retirement benefits but is not entitled to the tax exemption. That a retiree cannot be deprived of retirement benefits but can be deprived of the tax exemption underscores the fact that the "accrued financial benefit" of a pension plan is the pension income itself, not any tax exemption that might at some moment in time be attached to that income.[27]

For these reasons, reducing or eliminating the statutory exemption for public-pension incomes as set forth in MCL 206.30 does not impair accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24.

---

[27] The problem with Justice HATHAWAY's opinion is that it does not recognize this distinction between pension benefits and tax exemptions, but treats them as being one and the same and then summarily concludes that because pension benefits constitute an "accrued financial benefit," the applicable tax exemption must be one as well. It does this with no analysis of the dispositive language "accrued financial benefit" and thus offers no explanation for its conclusion that the tax exemption itself, as distinguished from the pension benefits, constitutes an "accrued financial benefit." Justice HATHAWAY contends that we "create[] an unnecessary distinction" because "a tax is a tax, whether it comes in the form of a direct tax increase or the elimination of a deduction." *Post* at 9. We agree that there is no significant distinction for present purposes between a tax increase and the elimination of a deduction, and we make no such distinction. Again, the distinction that Justice HATHAWAY misses is the one between pension benefits and tax exemptions, not the one between a tax increase and the elimination of a deduction. Finally, Justice HATHAWAY cites an opinion of the Attorney General for the proposition that a tax exemption is a "financial benefit" without noting that the Attorney General expressly stated in the same opinion that he was not answering the question that is now at issue: "whether the Legislature may, without violating Const 1963, art 9, § 24, limit or repeal the tax exemptions in the four retirement statutes . . . as to current retirees and members without providing equal alternative benefits in place thereof." OAG, 1991-1992, No 6697, p 121 (December 18, 1991).

19

## B. CONTRACTUAL OBLIGATION

The second issue contained in the Governor's request for an advisory opinion concerns whether reducing or eliminating the statutory tax exemption for pension incomes as set forth in MCL 206.30 impairs a contractual obligation in violation of Const 1963, art 1, § 10 or US Const, art I, § 10(1). Const 1963, art 1, § 10 provides, "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." Similarly, US Const, art I, § 10(1) provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." As discussed earlier, Const 1963, art 9, § 24 provides that an accrued public pension is a "contractual obligation." However, as also discussed earlier, "the obligation of [the] contract" specifically consists of the pension income, not the tax exemption of that income, and thus reducing or eliminating the tax exemption does not affect, much less impair, the obligation of the contract.

Several of the amicus curiae briefs argue that regardless of whether the tax exemption is an "accrued financial benefit" and thus a "contractual obligation" for purposes of Const 1963, art 9, § 24, merely by enacting a statutory tax exemption, the Legislature created a contractual right to this exemption that cannot subsequently be diminished without violating Const 1963, art 1, § 10. However, as this Court has explained:

> Of primary importance to the viability of our republican system of government is the ability of elected representatives to act on behalf of the people through the exercise of their power to enact, amend, or repeal legislation. Therefore, a fundamental principle of the jurisprudence of both the United States and this state is that one legislature cannot bind the power of a successive legislature. . . .

\* \* \*

20

Although this venerable principle that a legislative body may not bind its successors can be limited in some circumstances because of its tension with the constitutional prohibitions against the impairment of contracts, thus enabling one legislature to contractually bind another, such surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments. A necessary corollary of these limitations that has been developed by the United States Supreme Court, and followed by this Court, is the *strong presumption that statutes do not create contractual rights*. This presumption, and its relation to the protection of the sovereign powers of a legislature, was succinctly described by the United States Supreme Court in [*Nat'l R Passenger Corp v Atchison, T & S F R Co*, 470 US 451, 465-466; 105 S Ct 1441; 84 L Ed 2d 432 (1985)]:

> "For many decades, this Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' . . . This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. . . . Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, '"[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation."' Thus, the party asserting the creation of a contract must overcome this well-founded presumption, . . . and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." [*Studier*, 472 Mich at 660-662 (citations omitted; emphasis added).]

Accordingly, "[i]n order for a statute to form the basis of a contract, the statutory language 'must be "plain and susceptible of no other reasonable construction" than that the Legislature intended to be bound to a contract.'" *Id*. at 662 (citations omitted). That is, "[b]efore a statute, particularly one relating to taxation, should be held to be irrepealable or not subject to amendment, an intent not to repeal or amend must be so

21

directly and unmistakably expressed as to leave no reason for doubt. Otherwise the intent is not plainly expressed." *Harsha v Detroit*, 261 Mich 586, 594; 246 NW 849 (1933).

For example, "[i]f the statutory language 'provides for the execution of a written contract *on behalf of the state* the case for an obligation binding upon the state is clear.'" *Studier*, 472 Mich at 662, quoting *Nat'l R Passenger Corp*, 470 US at 466 (citation and quotation marks omitted). Statutes containing an express covenant not to amend the legislation are also deemed to create contractual obligations. *Studier*, 472 Mich at 663. "But, 'absent "an adequate expression of an actual intent" of the State to bind itself,' courts should not construe laws declaring a scheme of public regulation as also creating private contracts to which the state is a party." *Id.* at 662, quoting *Nat'l R Passenger Corp*, 470 US at 466-467, quoting *Wisconsin & Mich R Co v Powers*, 191 US 379, 386-387; 24 S Ct 107; 48 L Ed 229 (1903).[28]

As was the case in *Studier*, none of the statutory tax exemption provisions that are at issue here contain any language "provid[ing] for a written contract on behalf of the state of Michigan or even use terms typically associated with contractual relationships, such as 'contract,' 'covenant,' or 'vested rights.'" *Studier*, 472 Mich at 663-664.[29] "Had

_____

[28] In *Studier*, 472 Mich at 668, this Court held that the statute establishing health-care benefits for public school retirees, MCL 38.1391(1), does not create a contractual right to receive health-care benefits because "the plain language of MCL 38.1391(1) does not clearly indicate that the Legislature intended to surrender its legislative powers through the statute's enactment . . . ."

[29] See, for example, the former tax exemption provision of the State Employees' Retirement Act, MCL 38.40(1), as amended by 2002 PA 99, which provided:

The right of a person to a pension, an annuity, a retirement allowance, any optional benefit, any other right accrued or accruing to any person under the provisions of this act, the various funds created by this act,

22

and all money and investments and income of the funds, *are exempt* from any state, county, municipal, or other local tax. [Emphasis added.]

The fact that the language "are exempt" was put in the present tense indicates that the Legislature simply intended pension and retirement incomes to be exempt from taxation while this statutory language remained the law. However, it does not indicate any intent to forever prohibit a future Legislature from changing this law and making pension and retirement incomes subject to taxation. See also *Sheehy v Pub Employees Retirement Div*, 262 Mont 129, 134; 864 P2d 762, 765 (1993) ("[The statute] provides that state retirement benefits are exempted from state tax. The use of the present tense 'are' indicates that the statute is a statement of current policy regarding public employment. The statute contains no manifestation of legislative intent to create private and enforceable contractual rights . . . ; nor does it make or imply any promises regarding ongoing or future tax treatment of state retirement benefits.") (italics omitted).

Similarly, the Public School Employees Retirement Act formerly provided:

A retirement allowance, an optional benefit, or any other benefit accrued or accruing to a person under this act, the reserves created by this act, and the money, investments, or income of those reserves *are exempt* from state, county, municipal, or other local tax and subject to the public employee retirement benefit protection act." [MCL 38.1346(1), as amended by 2002 PA 94 (emphasis added).]

The Michigan Legislative Retirement System Act formerly provided, "All retirement allowances and other benefits payable under this act and all accumulated credits of members, deferred vested members, and retirants in this retirement system *are not* subject to taxation by this state or any political subdivisions of this state." MCL 38.1057(1), as amended by 2002 PA 97 (emphasis added). The city library employees' retirement system act formerly provided:

When a system of retiring allowances is adopted under the provisions of this act, the reserve fund thereby provided shall be free from all state, county, township, city, village and school district taxes and the annuities payable to the members of the staff shall likewise be free from all such taxes. [MCL 38.705, as added by 1927 PA 339.]

And the Judges Retirement Act provided, "Distributions from employer contributions made pursuant to [MCL 38.2664(1) and (3)] and earnings on those employer contributions, and distributions from employee contributions made pursuant to [MCL 38.2664 714(3)] and earnings on those employee contributions, *are exempt* from any

23

the Legislature intended to surrender its legislative powers through the creation of contractual rights, it would have expressly done so by employing such terms." *Id.* at 664. And, as in *Studier*, "nowhere in the statute[s] did the Legislature covenant that it would not amend the statute[s] to remove or diminish the obligation" in question. *Id.* at 665. "Again, had the Legislature intended to surrender its power to make such changes, it would have done so explicitly." *Id.*[30] "Thus, there is no indication that the Legislature

---

state, county, municipal, or other local tax." MCL 38.2670(1), as amended by 2002 PA 95 (emphasis added).

Each of these acts was amended to remove the statutory exemption from state taxes consistently with 2011 PA 38. See 2011 PA 41, 2011 PA 42, 2011 PA 43, 2011 PA 44, and 2011 PA 45. For example, as amended by 2011 PA 41, the State Employees' Retirement Act, MCL 38.40, now provides, in relevant part:

> (1) Except as otherwise provided in this section, the right of a person to a pension, an annuity, a retirement allowance, and any optional benefit and any other right accrued or accruing to any person under the provisions of this act, the various funds created by this act, and all money and investments and income of the funds are exempt from any state, county, municipal, or other local tax.

> (2) Beginning January 1, 2012, the right of a person to a pension, an annuity, a retirement allowance, and any optional benefit, and any other right accrued or accruing to any person under the provisions of this act, is subject to state tax upon distribution to the person from the various funds created by this act.

[30] As this Court stated in *Studier*, 472 Mich at 664 n 22:

> It is clear that the Legislature can use such nomenclature when it wishes to. For instance, when enacting 1982 PA 259, which requires the state treasurer to pay the principal of and interest on all state obligations, the Legislature provided in MCL 12.64: "*This act shall be deemed a contract* with the holders from time to time of obligations of this state." (Emphasis added.) Similarly, when enacting the State Housing Development Authority Act, 1966 PA 346, the Legislature provided in MCL 125.1434: "*The state pledges and agrees* with the holders of any

24

that enacted [these provisions] intended to do anything beyond . . . set forth a policy to be pursued until one of its successor legislatures ordained a new policy." *Id.* at 665-666. Because there is no language in any of the statutory tax exemption provisions at issue here indicating that the Legislature intended to be contractually bound by these provisions forever, and because Const 1963, art 9, § 2 prohibits the Legislature from contracting away its taxing authority, we conclude that the tax exemption statutes do not create contractual rights that cannot be altered by the Legislature. Indeed, it is "well established that a taxpayer does not have a vested right in a tax statute or in the continuance of any tax law." *Detroit v Walker*, 445 Mich 682, 703; 520 NW2d 135 (1994); see also *Ludka v Dep't of Treasury*, 155 Mich App 250, 260; 399 NW2d 490 (1986) (noting that the Legislature is free to take rights that arise under a tax statute away at any time); *United States v Carlton*, 512 US 26, 33; 114 S Ct 2018; 129 L Ed 2d 22 (1994) ("Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code.").[31]

_____

notes or bonds issued under this act, *that the state will not limit or alter the rights vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of the holders* until the notes or bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders, are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such notes or bonds." (Emphasis added.)

[31] Indeed, in *Carlton*, 512 US at 33, the United States Supreme Court went so far as to hold that applying an amended tax statute *retroactively* does not violate the United States Constitution even when a taxpayer has "specifically and detrimentally relied on the preamendment version" of the tax statute. It is unnecessary that we address that question in the context of the Michigan Constitution.

For these reasons, reducing or eliminating the statutory tax exemption for pension incomes as set forth in MCL 206.30 does not impair any contractual obligation in violation of Const 1963, art 1, § 10 or US Const, art I, § 10(1). In short, we are able to identify absolutely no provision within either constitution that provides that public employees, and *only* public employees, are entitled in perpetuity to receive pension income without having to pay taxes on that income and that such income alone will be forever exempt from having to support the costs of government. The opposing Attorney General contends that, come war, come natural disaster, come impending bankruptcy, only the pension income of public employees, among all individual income, will be off-limits from ever being used to pay the costs of government, including, significantly, the costs of public employees themselves. The opposing Attorney General, in our judgment, argues in behalf of a Constitution that does not exist, and we firmly reject those arguments.

## C. EQUAL PROTECTION

The third issue concerns whether determining eligibility for income-tax exemptions on the basis of date of birth as set forth in MCL 206.30(9) violates the equal protection of the law under Const 1963, art 1, § 2 or the Fourteenth Amendment of the United States Constitution. Const 1963, art 1, § 2 states, in pertinent part, "No person shall be denied the equal protection of the laws . . . ." Similarly, US Const, Am XIV, § 1 states, "[N]or shall any state . . . deny to any person within its jurisdiction the equal

26

protection of the laws."[32]  "Of course, most laws differentiate in some fashion between classes of persons." *Nordlinger v Hahn*, 505 US 1, 10; 112 S Ct 2326; 120 L Ed 2d 1 (1992).  Indeed, the enactment of laws that differentiate between classes of persons lies at the heart of the legislative power.  Welfare laws that apportion benefits on the basis of income, criminal laws that establish terms of imprisonment on the basis of conduct and criminal histories, and tax laws that take into account such circumstances of the taxpayer as the number of children, the amount of charitable contributions, and the level of medical expenses all differentiate among legislatively determined classes of persons. "The Equal Protection Clause does not forbid classifications."  *Id.*  "It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Id.*  "As a general rule, 'legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'"  *Id.*, quoting *McGowan v Maryland*, 366 US 420, 425-426; 81 S Ct 1101; 6

---

[32] "This Court has held that Michigan's equal protection provision is coextensive with the Equal Protection Clause of the United States Constitution."  *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010).

> "By this, we do not mean that we are bound in our understanding of the Michigan Constitution by any particular interpretation of the United States Constitution.  We mean only that we have been persuaded in the past that interpretations of the Equal Protection Clause of the Fourteenth Amendment have accurately conveyed the meaning of Const 1963, art 1, § 2 as well."  [*Id.* at 319 n 7, quoting *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003).]

Cf. *Lind v Battle Creek*, 470 Mich 230, 235; 681 NW2d 334 (2004) (YOUNG, J., concurring) ("The Michigan Equal Protection Clause, Const 1963, art 1, § 2, unlike the federal counterpart contained in the Fourteenth Amendment, explicitly prohibits discrimination on the basis of race.") (emphasis omitted).

27

L Ed 2d 393 (1961). Accordingly, the United States Supreme Court has made it "clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger*, 505 US at 10.[33] This is known as the "rational basis" standard. Any less deferential standard of review would transform this Court into a body in which review, and reversal, of the judgments of the Legislature would become increasingly routine given the ordinary incidence of laws in which the Legislature has established classifications among persons.

The opposing Attorney General argues that a heightened standard of review-- specifically, strict scrutiny-- is required because there is a constitutional right to a tax-free pension. But, of course, this Court has determined this proposition to the contrary. For the reasons discussed with regard to the first two issues, there is no constitutional right to a tax-free pension. There is no right on the part of public employees, alone among all persons, to such a benefit. Furthermore, even if there were such a constitutional right, not all constitutional rights warrant application of the strict-scrutiny standard, only those that are considered "fundamental rights," i.e., those rights "traditionally protected by our society" and "implicit in the concept of ordered liberty." *Phillips*, 470 Mich at 434

---

[33] The corollary of this is that "[f]or a decision to be subject to [strict] scrutiny, it must be a classification that is based on 'suspect' factors such as race, national origin, ethnicity, or a 'fundamental right.'" *Phillips*, 470 Mich at 432 (citations omitted); see also *Massachusetts Bd of Retirement v Murgia*, 427 US 307, 312; 96 S Ct 2562; 49 L Ed 2d 520 (1976) ("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.").

(citations and quotation marks omitted). The right to a tax-free pension has never been held to be a constitutional right, much less a fundamental right.[34]

It is uncontested that the classification at issue here does not involve a suspect class because age has never been held to constitute such a class. *Massachusetts Bd of Retirement v Murgia*, 427 US 307, 314; 96 S Ct 2562; 49 L Ed 2d 520 (1976) ("Even if the statute could be said to impose a penalty upon a class defined as the aged, it would not impose a distinction sufficiently akin to those classifications that we have found suspect to call for strict judicial scrutiny."); *Kimel v Florida Bd of Regents*, 528 US 62, 83; 120 S Ct 631; 145 L Ed 2d 522 (2000) ("[A]ge is not a suspect classification under the Equal Protection Clause. States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest.") (citations omitted). Because the classification at issue here does not pertain to either a fundamental right or a suspect class, the rational-

---

[34] The opposing Attorney General also argues that differential treatment on the basis of marital status requires a higher level of scrutiny. However, marital status classifications have never been accorded any heightened scrutiny under the Equal Protection Clause. See *Smith v Shalala*, 5 F3d 235, 239 (CA 7, 1993) ("Because [a] classification based on marital status does not involve a suspect class . . . , we must examine it under the rational basis test."), cert den 510 US 1198 (1994); *Zablocki v Redhail*, 434 US 374, 403; 98 S Ct 673; 54 L Ed 2d 618 (1978) (Stevens, J., concurring) ("When a state allocates benefits or burdens, it may have valid reasons for treating married and unmarried persons differently. Classification based on marital status has been an accepted characteristic of tax legislation, Selective Service rules, and Social Security regulations."). There is a rational basis for allowing an individual who otherwise would not receive the pension exemption to receive it if his or her spouse was born before 1946. Married persons plan for their financial futures together, and when one spouse cannot easily adjust to or absorb changes in a tax law because of his or her age, the other spouse necessarily shares in that burden. The marital-status distinction rationally furthers the state's legitimate interest in protecting the reasonable reliance interests of both retirees and their spouses.

basis standard is applicable. "[B]ecause an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving that the 'facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" *Kimel*, 528 US at 84, quoting *Vance v Bradley*, 440 US 93, 111; 99 S Ct 939; 59 L Ed 2d 171 (1979).

The rational-basis standard is "a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Murgia*, 427 US at 314. "Perfection in making the necessary classifications is neither possible nor necessary." *Id.* "Such action by a legislature is presumed to be valid." *Id.* Therefore, under the rational-basis standard, "'courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose.'" *Phillips*, 470 Mich at 433, quoting *Crego v Coleman*, 463 Mich 248, 259; 615 NW2d 218 (2000). "The rational basis test does not test 'the wisdom, need, or appropriateness of the legislation . . . .'" *Phillips*, 470 Mich at 434, quoting *Crego*, 463 Mich at 260. Instead, "[t]his highly deferential standard of review requires a challenger to show that the legislation is 'arbitrary and wholly unrelated in a rational way to the objective of the statute.'" *Phillips*, 470 Mich at 433, quoting *Crego*, 463 Mich at 259, quoting *Smith v Employment Security Comm*, 410 Mich 231, 271; 301 NW2d 285 (1981).

"This standard is especially deferential in the context of classifications made by complex tax laws." *Nordlinger*, 505 US at 11. "'[I]n structuring internal taxation schemes "the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation."'" *Id.*, quoting *Williams v*

*Vermont*, 472 US 14, 22; 105 S Ct 2465; 86 L Ed 2d 11 (1985), quoting *Lehnhausen v Lake Shore Auto Parts Co*, 410 US 356, 359; 93 S Ct 1001; 35 L Ed 2d 351 (1973); see also *Regan v Taxation with Representation of Washington*, 461 US 540, 547; 103 S Ct 1997; 76 L Ed 2d 129 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."). Indeed, "'in taxation, even more than in other fields, legislatures possess the greatest freedom in classification.'" *San Antonio Indep Sch Dist v Rodriguez*, 411 US 1, 41; 93 S Ct 1278; 36 L Ed 2d 16 (1973), quoting *Madden v Kentucky*, 309 US 83, 88; 60 S Ct 406; 84 L Ed 590 (1940). Given "'[t]he broad discretion as to classification possessed by a legislature in the field of taxation [that] has long been recognized . . . , the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes . . . .'" *San Antonio Indep Sch Dist*, 411 US at 40-41, quoting *Madden*, 309 US at 87-88.[35] "'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Lehnhausen*, 410 US at 364, quoting *Madden*, 309 US at 88.

In this case, there is a rational basis for grounding a taxpayer's eligibility for the pension exemption upon date of birth: older persons, who are obviously more likely to be already retired or approaching retirement, have relied more on the exemption and will be less able to garner additional future income to offset the loss of the exemption. The United States Supreme Court "has acknowledged that classifications serving to protect

---

[35] "'[T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies.'" *San Antonio Indep Sch Dist*, 411 US at 40, quoting *Madden*, 309 US at 88.

legitimate expectation and reliance interests do not deny equal protection of the laws."

*Nordlinger*, 505 US at 13.[36]  Indeed, "'[t]he protection of reasonable reliance interests is

not only a legitimate governmental objective: it provides an exceedingly persuasive

justification . . . .'"  *Id.*, quoting *Heckler v Mathews*, 465 US 728, 746; 104 S Ct 1387; 79

L Ed 2d 646 (1984).  Recognizing that older individuals may have a "diminishing earning

capacity" also constitutes an altogether legitimate reason for basing eligibility for the

pension exemption on age.  *Cruz v Chevrolet Grey Iron Div of Gen Motors Corp*, 398

Mich 117, 133-134 (opinion by COLEMAN, J.), 137-138 (opinion by LEVIN, J.); 247

NW2d 764 (1976) (holding that the "diminishing earning capacity" of older workers

constitutes a rational basis for the provision in the Worker's Disability Compensation

Act, MCL 418.357, that provides for reduction in compensation payments to employees

over the age of 65).[37]

---

[36] There is an obvious distinction between this Court's recognition that older employees may have relied on an expectation of a certain level of pension, and even on a tax-free pension, and holding that these employees possess a constitutional right to such an exemption.  The former implicates a matter of public policy, and the latter implicates a matter of constitutional law.

[37] We also reject the opposing Attorney General's argument that because 2011 PA 38 creates closed classes-- that is, it stratifies groups by date of birth and not merely by age, thereby prohibiting new members from joining the more favorably treated group as they themselves age-- it is a capriciously designed system.  To the contrary, there is a rational basis for this: the state is attempting to phase out the availability of the broadest exemptions and deductions for pension incomes altogether.  While the legislation is designed to protect older pensioners who have greater reliance on the pre-2011 PA 38 tax rules, the key protection built in to the stratified system is *from the changes immediately occurring in the tax code in 2012*.  That is, the Legislature has determined that it is not necessary to protect pensioners progressively as they age because the younger pensioners are at the time of the changes in 2012, the better they will be able to anticipate and plan for their tax liability when they retire.  The primary goal, which the stratified system achieves at a more gradual pace, is to equalize the tax burden among Michigan citizens, by means of having public pensioners share to a greater extent in the cost of government from the income they are continuing to earn in retirement.  Whether we agree or disagree

For these reasons, determining eligibility for income-tax exemptions on the basis of age or date of birth as set forth in MCL 206.30(9) does not violate the equal protection of the law under Const 1963, art 1, § 2 or the Fourteenth Amendment of the United States Constitution.[38]

## D.  GRADUATED INCOME TAX

The final issue concerns whether determining eligibility for income-tax exemptions and deductions on the basis of total household resources as set forth in MCL 206.30(7) and (9) creates a graduated income tax in violation of Const 1963, art 9, § 7. Const 1963, art 9, § 7 provides, "No income tax graduated as to rate or base shall be imposed by the state or any of its subdivisions."  A graduated income tax is generally understood to be a tax on income that imposes a proportionately greater tax burden on the earnings of higher-income taxpayers than on that of lower-income taxpayers.[39]  Const 1963, art 9, § 7 prohibits both an income tax graduated as to rate and an income tax graduated as to base.  It is uncontested by the parties that the provisions at issue here do not create an income tax graduated as to "rate" because all individual taxpayers will be required to pay a flat 4.35 percent income tax.  Instead, the issue is whether the provisions create an income tax graduated as to "base" because only certain taxpayers,

_____

with these policy determinations, there exists a rational basis to support the system designed by the Legislature to accomplish this goal, and thus it is neither capricious nor arbitrary.

[38] All seven justices agree that there is no equal protection violation.

[39] See OAG, 1965-1966, No 4428, p 53 (March 31, 1965) ("[T]he result forbidden by the Constitution is the imposition of a proportionately greater income tax burden on the income of high income groups than on that of low income tax groups.").

depending on their income levels, will be entitled to the personal exemption and to the $20,000 or $40,000 deduction.

It is also uncontested that a taxpayer's "base" consists of his or her net taxable income and that exemptions and deductions reduce a taxpayer's base by reducing the amount of a taxpayer's income subject to taxation.[40] That is, if a taxpayer is entitled to an exemption or deduction, his or her base is reduced, and if a taxpayer is not entitled to an exemption or deduction, his or her base is not reduced. Concomitantly, an *income-based* deduction or exemption is one to which taxpayers are, or are not, entitled as a function of their incomes. Traditionally, in a progressive or graduated tax system, taxpayers with lower incomes are allowed the exemption or deduction, while taxpayers with higher incomes are deprived of the exemption or deduction in order to create graduation. Consequently, everything else being equal, taxpayers with higher incomes will have *disproportionately* larger bases than taxpayers with lower incomes because a higher proportion of their income is included in their base. Therefore, income-based exemptions and deductions result in an income tax that is graduated as to base, which can occur even when all income is taxed at a flat rate.[41] This is exactly what the ratifiers of

---

[40] See Black's Law Dictionary (6th ed), which defines "tax deduction" as "[a] subtraction from gross income in arriving at taxable income" and defines "tax exemption" as "[i]mmunity from the obligation of paying taxes in whole or in part." "Tax deductions are technically different from tax exemptions, but the effect of both is to reduce gross income in computing taxable income." Black's Law Dictionary (5th ed), p 1310.

[41] It is not in dispute that the Legislature can enact nonincome-based exemptions and deductions even though such exemptions and deductions may have the incidental effect of creating different *effective* tax rates. See the Address to the People, which specifically states that "[t]he legislature could prescribe reasonable exemptions for a flat rate tax." 2 Official Record, Constitutional Convention 1961, p 3399. Accordingly, the supporting Attorney General's point that there are already numerous nonincome-based exemptions

34

our Constitution explicitly prohibited by adopting § 7, which provides, "No income tax graduated as to . . . base shall be imposed by the state . . . ."[42] We do not believe that the ratifiers could have been any clearer in their intent to prohibit a graduated income tax, and we believe that the statutory provisions at issue here create such a prohibited tax.

MCL 206.30(7) conditions a taxpayer's entitlement to the personal exemption on his or her income. If a taxpayer's income is less than $75,000 for a single return or $150,000 for a joint return, the taxpayer is fully entitled to the $3,700 personal exemption. However, if a taxpayer's income is between $75,000 and $100,000 for a single return or between $150,000 and $200,000 for a joint return, the taxpayer is only entitled to a declining proportion of the exemption, and this proportion depends entirely on the extent to which the taxpayer's income exceeds the threshold levels of $75,000 for a single return or $150,000 for a joint return.[43] Finally, if a taxpayer's income exceeds

in Michigan law is not germane to what is at issue here, i.e., whether income-based exemptions and deductions violate Const 1963, art 9, § 7.

[42] The supporting Attorney General argues that Const 1963, art 9, § 7 only prohibits an income tax in which, as this Court stated in *Kuhn v Dep't of Treasury*, 384 Mich 378, 388-389; 183 NW2d 796 (1971), "different rates of tax [are applied to] different segments of taxable income of the person being taxed." However, this argument takes that statement from *Kuhn* out of context. *Kuhn* also held that the act at issue does not violate § 7 because "[t]he rates of tax imposed by the Act are *uniformly applicable to all taxable income of every taxpayer in each class*" and " [t]he credits for property and income taxes are allowed against the tax liability of *all taxpayers without regard to their income*." *Id.* at 389 (citation and quotation marks omitted; emphasis added). This language clearly demonstrates that *Kuhn* recognized that treating *different* taxpayers *differently* on the basis of their income could well run afoul of § 7.

[43] More specifically, MCL 206.30(7) provides, in pertinent part:

> For a taxpayer whose total household resources are $75,000.00 or more for a single return or $150,000.00 or more for a joint return, the personal exemption allowed under [MCL 206.30(2)] shall be adjusted by

35

$100,000 for a single return or $200,000 for a joint return, the taxpayer is not entitled to any portion of the $3,700 personal exemption. This "phase-out" of the personal exemption creates an income tax graduated as to base because entitlement to the exemption-- and the extent of such entitlement, which reduces the taxpayer's base-- is entirely dependent on the taxpayer's income level.[44] To the extent that MCL 206.30(7)

multiplying the exemption for the tax year for a single return by a fraction, the numerator of which is $100,000.00 minus the taxpayer's total household resources, and the denominator of which is $25,000.00, and for a joint return by a fraction, the numerator of which is $200,000.00 minus the taxpayer's total household resources, and the denominator of which is $50,000.00.

[44] Phase-outs have been commonly recognized as a means of creating a graduated or "progressive" income tax. See, e.g., Schuyler, *Phase-Outs Are Bad Tax Policy*, Institute for Research on the Economics of Taxation Economic Policy Bulletin No. 71, January 1998, p 4 <http://iret.org/pub/BLTN-71.PDF> ("Phase-outs . . . heighten tax progressivity.") (accessed October 31, 2011); Viard, *The Tax Code's Burdens on Families and Individuals*, American Enterprise Institute for Public Policy Research, April 13, 2011 <http://www.aei.org/article/103457> ("Phase-outs add to the progressivity of the tax system by raising taxes on those with higher incomes through the reduction or elimination of selected tax preferences. Like other measures that promote progressivity, phase-outs also increase the effective marginal tax rates faced by taxpayers.") (accessed October 31, 2011); *A Stealth Tax Hike*, Wall St J, June 29, 2011 <http://online.wsj.com/ article/SB10001424052702304314404576414062080484714.html> ("The idea is that once taxpayers earn a certain amount of money . . . they would begin to lose the value of the various deductions they're entitled to under the law. . . . Earn enough money and soon the value of those deductions goes to zero. The political point of this exercise is to raise marginal tax rates without appearing to do so. . . . The phase-out gambit is an attempt to shoe-horn more progressivity into the tax code without admitting it, and to do so in such a way that only tax experts will know what's going on.") (accessed October 31, 2011); Mitchell, *Lowering Marginal Tax Rates: The Key to Pro-Growth Tax Relief*, The Heritage Foundation, May 22, 2001 <http://www.heritage.org/research/reports/2001/ 05/lowering-marginal-tax-rates> ("Known as 'phase-outs,' these provisions withdraw certain tax benefits in the code when income reaches a certain level. Phase-outs have the effect of raising marginal tax rates by reducing the amount of money that can be deducted (or credited or exempted) from taxable income.") (accessed October 31, 2011); National Commission on Restructuring the Internal Revenue Service, *A Vision for a New IRS*, June 25, 1997, Appendix H, p 36 <http://www.house.gov/natcommirs/report1.pdf> ("[P]hase-

conditions a taxpayer's entitlement to the personal exemption on his or her income, it is an income tax graduated as to base[45] and plainly violative of Const 1963, art 9, § 7.[46]

With regard to the $20,000/$40,000 deduction, MCL 206.30(9) conditions a taxpayer's entitlement to the $20,000 deduction for a single return or $40,000 deduction for a joint return on his or her income. If a taxpayer's income is $75,000 or less for a single return or $150,000 or less for a joint return, the taxpayer may be entitled to the

outs are intended to increase progressivity by increasing the tax burden of higher income taxpayers . . . .") (accessed October 31, 2011).

[45] The supporting Attorney General argues that this is not true because the taxpayer's entitlement to the exemption is conditioned on the taxpayer's "total household resources," not on his or her income as defined by federal adjusted gross income (AGI). Given that the term "total household resources" is defined as including "all *income* received by all persons of a household in a tax year while members of a household," MCL 206.508(4) (emphasis added), we are unpersuaded by this argument. That this definition differs from the federal definition of "income" is also of no consequence because federal AGI is not the only proxy for income. "Income" can be defined on the margins in many different ways and still be recognizable as such. Accordingly, when the supporting Attorney General argues merely that "total household resources" is calculated differently from AGI or even "taxable income" as defined in MCL 206.30(1), this does not show that *the concept of "total household resources" differs qualitatively from the concept of income*. The Legislature cannot avoid the constitutional prohibition of a graduated income tax by simply replacing the term "income" with the term "total household resources" when these two terms are largely equivalent. That one term may include some forms of income that the other does not does not alter the fact that both terms are still at their core referring to income.

[46] The supporting Attorney General's answer to the following question suggests what would be left of the Constitution's prohibition against a graduated income tax if his arguments on income-based phase-outs prevailed:

> *Justice Markman*: [I]s it your argument that . . . akin to the alternative minimum tax which we have in the federal system, the Legislature could phase-out whatever deductions or exemptions it wanted to, [it] could phase them out at whatever rate of acceleration it wanted to, and it could phase them out completely at whatever low level it wanted to, and not be in violation of art 9, § 7.

> *Supporting Attorney General*: That is correct.

$20,000/$40,000 deduction. However, if the taxpayer's income exceeds $75,000 for a single return or $150,000 for a joint return, the taxpayer is not entitled to the $20,000/$40,000 deduction. This $75,000/$150,000 income limitation creates an income tax graduated as to base because entitlement to the $20,000/$40,000 deduction, which reduces a taxpayer's base, is entirely a function of the taxpayer's income level. Once again, to the extent that MCL 206.30(9) conditions a taxpayer's entitlement to the $20,000/$40,000 deduction on his or her income, it is an income tax graduated as to base and plainly violative of Const 1963, art 9, § 7.[47]

---

[47] To illustrate how 2011 PA 38 creates a graduated base by conditioning the receipt of the *personal exemption* on a taxpayer's income, consider the following individual taxpayers each taxed at a flat rate:

| Income | Pre-38 Exemption | Tax Base | PA 38 Exemption | PA 38 Tax Base |
|---|---|---|---|---|
| $10,000 | 3,600 | 6,400 | 3,600 | 6,400 |
| $50,000 | 3,600 | 46,400 | 3,600 | 46,400 |
| $87,500 | 3,600 | 83,900 | 1,800 | 85,700 |
| $100,000 | 3,600 | 96,400 | 0 | 100,000 |

The personal exemption is tied to inflation: in 2010 it was set at $3,600; in 2011, it will be $3,700. The exemption is kept constant here for demonstration purposes. Under the pre-2011 PA 38 exemption, every taxpayer receives a $3,600 personal exemption off the top of household income, and thus each taxpayer's base is reduced by the set amount irrespective of income. However, 2011 PA 38 alters the personal exemption system by phasing out the personal exemption at $75,000 and completely eliminating it at $100,000. Thus, the two right columns on the chart illustrate how the current income tax exemption would be affected by the new income-dependent provisions and how the exemption phase-out is precisely the kind of graduated income tax base that the Constitution prohibits: the two highest earners illustrated have larger tax bases on which they must pay the flat 4.35 percent tax rate, and their tax bases are larger to the extent that the exemption does not apply to them *for no other reason than their higher incomes*. By basing an income exemption solely on income, 2011 PA 38 effectively delays the point from which the tax clock will begin to run on income for some, but not all, taxpayers. Accordingly, it is contrary to a flat-tax system.

The $20,000 deduction employs a similar graduated structure by eliminating the ability to claim the deduction for earners who make more than $75,000. The only notable

The supporting Attorney General argues that the "base" language *only* prohibits taxation that is piggybacked on the federal tax liability. In support of this argument, he cites the Address to the People, which stated, in pertinent part:

> This is a new section making it clear that neither the state nor any local unit of government may impose a graduated income tax. The words "or base" are necessary to prevent "piggyback" taxation based on the federal tax liability. Without such language, a tax nominally imposed at a flat rate might actually adopt all of the graduation of the federal tax. [2 Official Record, Constitutional Convention 1961, p 3399.]

This language certainly does indicate that one purpose of using the term "base" was to prevent piggyback taxation, in which tax graduation is achieved by means of imposing a state income tax defined in terms of a particular percentage of the graduated federal income tax. However, nothing in the Address-- and, even more significantly, nothing in the text of the Constitution itself-- suggests that this was the *only* intended purpose of using "base." The necessary implication of the supporting Attorney General's argument is that the constitutional ratifiers intended to prohibit one, and only one, specific means of creating a graduated base, while permitting all other means of creating a graduated base. We do not believe that such an implication can fairly be drawn from a provision of the

difference between the two is that instead of providing a phase-out as the personal exemption does, it employs a "cliff" whereby as soon as an individual taxpayer earns more than $75,000, he or she loses the entire deduction. Thus, this also impermissibly conditions the receipt of a deduction affecting tax base on income criteria, thereby again creating impermissible graduation. Within the range in which both the exemption and the deduction would be phased out and/or eliminated ($75,000-$100,000), earners with pension income would incur the highest marginal tax rates by far under the statute-- the closer their earnings to the lower figure, the higher their rate.

Constitution that states, "*No* income tax graduated as to . . . base" shall be imposed by the state. Const 1963, art 9, § 7 (emphasis added).

This Court's understanding of the "base" language was also expressed by the delegates during the constitutional convention debates. For example, Delegate Van Dusen explained:

> Without the words "or base" you do not really have any protection against an *indirectly* graduated state income tax, because a flat rate tax imposed upon the federal tax liability would simply pick up all of the graduation of the federal liability. Without these words "or base" there is no question but what in my judgment a nominally flat rate tax could be made a graduated income tax. [1 Official Record, Constitutional Convention 1961, p 894 (emphasis added).]

That the delegates understood their new constitutional provision to prohibit the imposition of a graduated income tax, directly or indirectly, is clear. As Delegate Van Dusen further explained:

> The prohibition against the graduated income tax with which we are now dealing is one which has not been in our constitution up until now largely because the evil of the graduated income tax has not been as apparent until the last twenty years. The progressivity, the steep graduation of our federal system has taught us that this is a problem, and if there is to be some balance in our total tax structure—all of us, after all, are federal taxpayers as well as state taxpayers—this is a limitation which we as citizens of this state may reasonably impose upon our legislature. [*Id.* at 879-880.]

And Delegate Henry Woolfenden explained:

> This country has been built, in my judgment, in my conviction, because of equality of opportunity and not because of legislative equality. If we want to make equal by legislation, then we should join some socialist government; but I am in favor of equality of opportunity, and I think a graduated income tax which says if my next door neighbor earns twice as much money as I do that he should not pay twice as much, he should pay 4 times as much, is essentially an immoral tax. I am absolutely opposed to it . . . . I do not believe we are hamstringing the legislature; I think we are

40

merely stating the American philosophy of free enterprise and equality of opportunity. [*Id.* at 888.][48]

And Delegate O. Lee Boothby explained:

> There are 2 uses of taxes. The one use is to take care of the legitimate needs of government and that is the legitimate use, and the other use that has been seized upon by some people is to use taxation for the principle of distributing wealth. This is what I call a Robin Hood style of government where you take it from the rich and give it to the poor. I do not believe this is the legitimate purpose of taxation and I feel that it is necessary to write into the constitution a prohibition against a government adopting this theory of taking it from the rich and distributing it and leveling all people to the same status in society.
>
> * * *
>
> . . . I thought it was most interesting to note that 2,300 years ago the Greeks tried the so called progressive income tax—and there is nothing progressive about an income tax, it was tried 2,300 years ago by the Greeks, and a leading scholar of that day, Socrates, made this comment; he said:
>
> "It would appear that success is to be punished; that exorbitant taxes have made it a crime for man to prosper. The end result of such order can only be removal of incentive, the discouragement of our people and the destruction of our free society."
>
> When a few years later the Spartans came and attacked Athens, the Greeks did not seem to feel they had anything to fight for. [*Id.* at 890.]

Regardless of whether one today agrees or disagrees with the reasoning of the delegates in adopting Const 1963, art 9, § 7, one thing is clear: the delegates' understanding of this constitutional provision was that it would prohibit a graduated income tax, plain and simple,[49] and there is nothing whatsoever in the express language of this provision that

---

[48] The constitutional convention record indicates that an applause followed this statement and that several other delegates expressed their agreement.

[49] Given the rationale so clearly expressed by delegates in support of the prohibition of a graduated income tax, there is no conceivable reason why they would have been any less

would suggest in any way that the ratifiers' understanding was any different. Indeed, it is hard to identify any significant provision of the Michigan Constitution that is more explicit and more straightforward than Const 1963, art 9, § 7.[50]

This clarity undoubtedly explains Attorney General Frank Kelley's understanding of § 7 in 1965:

> The term "graduated rate" was used in reference to the Federal income tax rate structure. . . . The base restriction was to prohibit graduation by *indirection*. . . .
>
> \* \* \*
>
> Graduation as to base means producing the effect of a tax graduated as to rate by reducing the tax base for lower incomes and increasing it for higher incomes received by a particular class of taxpayers within a tax period. In either instance, the result forbidden by the Constitution is the imposition of a proportionately greater income tax burden on the income of high income groups than on that of low income tax groups. Granting of a deduction and/or applying a uniform rate to all in a class is valid so long as the classification is reasonable and is not made in reference to the amount of income received in a tax period. [OAG, 1965-1966, No 4428, pp 52-53 (March 31, 1965) (emphasis added).]

---

concerned about a graduated income tax that is created *directly* by conditioning eligibility for deductions and exemptions on taxpayers' income levels than they would have been about a graduated income tax that is created *indirectly* by imposing an income tax defined in terms of a particular percentage of the undeniably graduated federal income tax.

[50] It is also interesting to note that the people of this state have rejected, in substantial numbers, three efforts to *repeal* the prohibition against a graduated income tax in Const 1963, art 9, § 7. See Citizens Research Council, *Amending the Michigan Constitution: Trends and Issues*, No 360-03 at 8 (March, 2010) <http://www.crcmich.org/PUBLICAT/2010s/2010/rpt36003.html> (accessed November 1, 2011). A 1968 repeal proposal was rejected by 76.7 percent of the voters; a 1972 repeal proposal was rejected by 68.7 percent of the voters; and a 1976 repeal proposal was rejected by 72.2 percent of the voters. See Michigan Department of State, *Initiatives and Referendums under the Constitution of the State of Michigan of 1963*, December 5, 2008 <http://www.michigan.gov/documents/sos/Const_Amend_189834_7.pdf> (accessed November 1, 2011).

Furthermore, this is also the understanding of § 7 adopted by this Court. In *Kuhn v Dep't of Treasury*, this Court held that tax credits for property tax and city income tax liability did not violate Const 1963, art 9, § 7 because, as the Court of Appeals had explained,

> "[t]he credits for property and income taxes are allowed against the tax liability of all taxpayers *without regard to their income*. The limitations upon the amounts of credits that may be claimed by a taxpayer are *not based upon the taxpayer's income*; the effect is not to impose a tax violative of the constitutional prohibition against a tax graduated as to rate or base." [*Kuhn v Dep't of Treasury*, 384 Mich 378, 389; 183 NW2d 796 (1971), quoting *Kuhn v Dep't of Treasury*, 15 Mich App 364, 371; 166 NW2d 697 (1968) (emphasis added).]

That this Court focused on the fact that a taxpayer's entitlement to the credits was not determined by the taxpayer's income-- and ultimately upheld the credits-- suggests that it may have believed that basing a taxpayer's entitlement to a credit on his or her income might run afoul of Const 1963, art 9, § 7.[51] Thus, the implication of this Court's reasoning in *Kuhn* is that the Court believed that an income-based credit *might* be a "tax violative of the constitutional prohibition against a tax graduated as to rate or base."

Indeed, in *Butcher v Dep't of Treasury*, we recognized that "by closely examining the credits, exclusions, and exemptions . . . challenged [in *Kuhn*], we at least implied that a constitutional violation can occur by the use of income criteria for determining their amounts" and that "'[t]he dispositive question [was] whether the credit at issue indirectly creates a progressive or graduated *income tax rate*.'" *Butcher v Dep't of Treasury*, 425

---

[51] See also *Rosenbaum v Dep't of Treasury*, 77 Mich App 332, 336; 258 NW2d 216 (1977) ("Once the credit is computed it is allowed *without regard to the taxpayer's income*. Therefore, it does not create either directly *or indirectly* a graduated tax rate or base.") (emphasis added).

Mich 262, 273-274; 389 NW2d 412 (1986), quoting *Butcher v Dep't of Treasury*, 141 Mich App 116, 121; 366 NW2d 15 (1984) (emphasis in the original). We held that the credit at issue, i.e., the property-tax credit, did not create a graduated income tax even though it was income-dependent because it was "in effect a *property tax rebate* that employs the income tax as a vehicle for its reconciliation" and, thus, "art 9, § 7, which is concerned only with *income taxes*, [was] inapplicable . . . ." *Butcher*, 425 Mich at 276 (emphasis added).[52] We reached this conclusion because "'a property taxpayer may file for this property tax rebate and receive such a rebate even if the computed rebate exceeds the amount of income taxes the property taxpayer might owe or even if the property taxpayer has no state income tax liability whatsoever.'" *Id.* at 274, quoting *Butcher*, 141 Mich App at 122. Unlike the property-tax credit at issue in *Butcher*, it is uncontested that the income-tax exemptions and deductions at issue in the instant case are clearly *income taxes*. The only question is whether they are *graduated* income taxes and, for the reasons explained above, we conclude that they are.

We conclude that determining eligibility for income-tax exemptions and deductions on the basis of total household resources as set forth in MCL 206.30(7) and (9) creates a graduated income tax in violation of Const 1963, art 9, § 7.[53]

---

[52] More specifically, the issue involved an amendment of an already existing local property tax credit that reduced this credit by 10 percent for each $1,000 of household income in excess of $65,000.

[53] All seven justices agree that MCL 206.30(7) and (9) create a graduated income tax in violation of Const 1963, art 9, § 7.

## E. SEVERABILITY

Pursuant to MCL 8.5, these portions of 2011 PA 38, in our judgment, can be severed from the remainder of the act, which is constitutional with respect to all the issues raised.[54] MCL 8.5 provides:

> In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:

> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

This Court has long recognized that "[i]t is the law of this State that if invalid or unconstitutional language can be deleted from an ordinance and still leave it complete and operative then such remainder of the ordinance be permitted to stand." *Eastwood Park Amusement Co v East Detroit Mayor*, 325 Mich 60, 72; 38 NW2d 77 (1949). The only unconstitutional portions of the act at issue here are those that ground eligibility for the personal exemption and for the $20,000/$40,000 deduction on the taxpayer's income.

We are convinced that severing these unconstitutional provisions is not inconsistent with the manifest intent of the Legislature. MCL 8.5. First, there is no indication in the act that the drafters of 2011 PA 38 intended a different severability rule

---

[54] At oral argument, the supporting Attorney General, i.e., the attorney representing the position of the Governor and the Legislature, indicated that *if* this Court were to conclude that portions of the act are unconstitutional-- as we now do-- the remedy would be to sever the unconstitutional portions of the act while preserving intact the remainder of the act.

than MCL 8.5 to apply.  Second, this is the remedy expressly requested by the supporting Attorney General, who represents the views of a majority of the Legislature.  And third, it seems clear to this Court that the Legislature "would have passed the statute had it been aware that portions therein would be declared to be invalid and, consequently, excised from the act."  *Pletz v Secretary of State*, 125 Mich App 335, 375; 336 NW2d 789 (1983); see also *Eastwood Park Amusement*, 325 Mich at 73 (stating the general rule that unconstitutional provisions may be severed even absent a severability clause if, among other conditions, "it is clear from the ordinance itself that it was the intent of the legislature to enact these provisions irrespective of the others") (citation and quotation marks omitted).  As the Legislature stated in the title of the act, 2011 PA 38 is "[a]n act to meet deficiencies in state funds . . . ."  The language limiting the personal exemption and the $20,000/$40,000 deduction are but two ways in which the Legislature has sought to accomplish this goal.  Although the extent to which 2011 PA 38 addressed "deficiencies in state funds" will be diminished to a small degree as the result of the severance, what will remain nonetheless enables the Legislature to realize its stated objectives.  As the result of severance, the estimated level of revenues from 2011 PA 38 will be reduced from $1.4237 billion in fiscal year 2012-2013 to $1.3325 billion, a reduction of 6.4 percent.[55]  We believe that, had the Legislature "been aware that portions [of 2011 PA 38] would be declared to be invalid and, consequently, excised from the act," *Pletz*, 125 Mich App at 375, it would nonetheless have enacted the remainder of this statute.

---

[55] See House Legislative Analysis, HB 4361 & 4362, June 8, 2011, p 11.

In addition, we are convinced that the remainder of the act can be given effect without the invalid portions. See MCL 8.5. When the unconstitutional language is severed, what remains is complete in and of itself, logical in its formulation and organization, and clearly in furtherance of the Legislature's stated goal of addressing "deficiencies in state funds."

In view of what we perceive to be the Legislature's intentions, and because severing the invalid portions does not render the remaining portions of 2011 PA 38 "inoperable," MCL 8.5, we sever the unconstitutional portions of MCL 206.30 as follows:

> (7) For each tax year beginning on and after January 1, 2013, the personal exemption allowed under subsection (2) shall be adjusted by multiplying the exemption for the tax year beginning in 2012 by a fraction, the numerator of which is the United States consumer price index for the state fiscal year ending in the tax year prior to the tax year for which the adjustment is being made and the denominator of which is the United States consumer price index for the 2010-2011 state fiscal year. The resultant product shall be rounded to the nearest $100.00 increment. As used in this section, "United States consumer price index" means the United States consumer price index for all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics. For each tax year, the exemptions allowed under subsection (3) shall be adjusted by multiplying the exemption amount under subsection (3) for the tax year by a fraction, the numerator of which is the United States consumer price index for the state fiscal year ending the tax year prior to the tax year for which the adjustment is being made and the denominator of which is the United States consumer price index for the 1998-1999 state fiscal year. The resultant product shall be rounded to the nearest $100.00 increment. ~~For a taxpayer whose total household resources are $75,000.00 or more for a single return or $150,000.00 or more for a joint return, the personal exemption allowed under subsection (2) shall be adjusted by multiplying the exemption for the tax year for a single return by a fraction, the numerator of which is $100,000.00 minus the taxpayer's total household resources, and the denominator of which is $25,000.00, and for a joint return by a fraction, the numerator of which is $200,000.00 minus the~~

47

taxpayer's total household resources, and the denominator of which is $50,000.00. The personal exemption allowed under subsection (2) shall not be allowed for a single taxpayer whose total household resources exceed $100,000.00 or for joint filers whose total household resources exceed $200,000.00.

* * *

(9) In determining taxable income under this section, the following limitations and restrictions apply:

(a) For a person born before 1946, this subsection provides no additional restrictions or limitations under subsection (1)(f).

(b) For a person born in 1946 through 1952, the sum of the deductions under subsection (1)(f)(*i*), (*ii*), and (*iv*) is limited to $20,000.00 for a single return and $40,000.00 for a joint return. After that person reaches the age of 67, the deductions under subsection (1)(f)(*i*), (*ii*), and (*iv*) do not apply and that person is eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return, which deduction is available against all types of income and is not restricted to income from retirement or pension benefits. However if that person's total household resources exceed $75,000.00 for a single return or $150,000.00 for a joint return, that person is not eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return. A person that takes the deduction under subsection (1)(e) is not eligible for the unrestricted deduction of $20,000.00 for a single return and $40,000.00 for a joint return under this subdivision.

(c) For a person born after 1952, the deduction under subsection (1)(f)(*i*), (*ii*), or (*iv*) does not apply. When that person reaches the age of 67, that person is eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return, which deduction is available against all types of income and is not restricted to income from retirement or pension benefits. If a person takes the deduction of $20,000.00 for a single return and $40,000.00 for a joint return, that person shall not take the deduction under subsection (1)(f)(*iii*) and shall not take the personal exemption under subsection (2). That person may elect not to take the deduction of $20,000.00 for a single return and $40,000.00 for a joint return and elect to take the deduction under subsection (1)(f)(*iii*) and the personal exemption under subsection (2) if that election would reduce that person's tax liability. However, if that person's total household resources exceed $75,000.00 for a single return or $150,000.00 for a joint return, that person is not eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return. A person that takes the deduction under subsection (1)(e) is not

eligible for the unrestricted deduction of $20,000.00 for a single return and $40,000.00 for a joint return under this subdivision.

> (d) For a joint return, the limitations and restrictions in this subsection shall be applied based on the age of the older spouse filing the joint return.

If the Legislature disagrees with this Court's determination that what remains in 2011 PA 38 after severance is "operable" pursuant to MCL 8.5, or believes that this determination is otherwise inconsistent with its intent, the Legislature is, of course, free to modify MCL 206.30 as it sees fit, subject only to the constraints of the state and federal constitutions.[56]

---

[56] Although Justice HATHAWAY agrees that those portions of the statutes that we sever must be struck down because they are unconstitutional, she nevertheless accuses us of "redraft[ing] a section of this act to provide tax deductions and exemptions that the Legislature clearly did not intend." *Post* at 1. Obviously, the Legislature *intended* to include these sections, else this Court would not now be confronted with the question of their constitutionality. However, *whenever* the Legislature enacts legislation that this Court deems unconstitutional, it is our responsibility to rectify that unconstitutionality, notwithstanding the Legislature's intent. The next question for any Court confronted with such a situation is to determine whether the unconstitutional language can be severed from the rest of the act without undermining the act, and in this regard, the Legislature's intent *is* controlling. And for the reasons discussed earlier, we believe that striking down only those portions of the act that are unconstitutional, rather than striking down entire sections, is more consistent with the Legislature's intentions. Contrary to Justice HATHAWAY's contention, we are in no way "assert[ing] that members of the Legislature would have known which words from each section it passed could be held unconstitutional." *Post* at 15-16. Obviously, we must, and do, assume that when the Legislature passed this act, it believed that the *entire* act was constitutional, or it would not have enacted it. However, because we reach a different conclusion, we must remediate what is unconstitutional. And by enacting MCL 8.5, the Legislature has informed us that when we sever unconstitutional language, this Court should leave intact all other language, as long as that language is "operable" and not "inconsistent with the manifest intent of the legislature." In light of our analysis of the purposes of the act, and the statements at oral argument of the lawyer representing the position of the Legislature and the Governor, we believe that we have reached the correct severance determination under MCL 8.5. If the intent of the Legislature is more truly in accord with the analysis of Justice HATHAWAY's opinion than with that of this opinion, the Legislature is, of course, free to act on its own to conform with that intent.

Further, in asserting as Justice HATHAWAY does that this Court should strike down the deduction and exemption sections in their entirety, we conclude that, just as the Legislature did not "intend" that this Court strike down the limited portions of the law

## IV. CONCLUSION

For all of these reasons, we hold that:

- Reducing or eliminating the statutory exemption for public-pension incomes as set forth in MCL 206.30 *does not* impair accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24; and

- Reducing or eliminating the statutory tax exemption for pension incomes as set forth in MCL 206.30 *does not* impair a contractual obligation in violation of Const 1963, art 1, § 10 or US Const, art I, § 10(1).

And we unanimously hold that:

- Determining eligibility for income-tax exemptions on the basis of date of birth as set forth in MCL 206.30(9) *does not* violate the equal protection of the law under Const 1963, art 1, § 2 or the Fourteenth Amendment of the United States Constitution; and

- Determining eligibility for income-tax exemptions and deductions on the basis of total household resources as set forth in MCL 206.30(7) and (9) *does* create a graduated income tax in violation of Const 1963, art 9, § 7.

---

that the Court determines to be unconstitutional, the Legislature also did not "intend" that the *entirety* of these sections be struck down.  Moreover, if we were to strike down these entire sections, and return the law to its status before 2011 PA 38 was passed, deductions and exemptions would *still* apply to those taxpayers earning $75,000 or more, just as they did before the enactment of the law.  Thus, at least in this respect, Justice HATHAWAY's proposed remedy is no different from ours: both would allow taxpayers earning $75,000 or more to receive these deductions and exemptions.

Finally, we hold that:

- Pursuant to MCL 8.5, the unconstitutional portions of 2011 PA 38 can reasonably be severed from the remainder of the act, which is constitutional with respect to all the issues raised.

Although Justice HATHAWAY agrees that those portions of the statutes that we sever ought to be struck down because they are unconstitutional, she nevertheless asserts that we are "judicially creating tax deductions and exemptions for individuals earning more than $75,000 annually . . . ." *Post* at 2. This is an odd assertion, given that she too would "create tax deductions and exemptions for individuals earning more than $75,000" by striking down the amendments of these provisions in their entirety and thereby returning the law to its pre-2011 PA 38 status, in which taxpayers earning more than $75,000 received these same deductions and exemptions.

We reemphasize that the questions before us are all constitutional questions. This Court is not deciding whether 2011 PA 38 represents wise or unwise, prudent or imprudent, public policy, only whether 2011 PA 38 is consistent with the constitutions of the United States and Michigan.

Stephen J. Markman
Robert P. Young, Jr.
Mary Beth Kelly
Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

*In re* REQUEST FOR ADVISORY
OPINION REGARDING
CONSTITUTIONALITY OF 2011 PA 38

No. 143157

---

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur in result only with part III(C) of the majority opinion because I do not believe 2011 PA 38 offends either the state or federal guarantees of equal protection under the law. Additionally, I concur in result only with part III(D) of the majority opinion because I agree that 2011 PA 38 violates the prohibition against a graduated income tax under Const 1963, art 9, § 7. However, I respectfully dissent from part III(A) of the majority opinion because, in my view, 2011 PA 38 violates Const 1963, art 9, § 24 as to those pension benefits that will have accrued before January 1, 2012, when 2011 PA 38 goes into effect. I would hold that the right to the statutory tax exemptions provided by the former MCL 206.30(1)(f) and similar statutes is an accrued financial benefit that attaches to the pension benefits at the time they accrue and that the right to the deferred exemption is therefore a contractual obligation that may not be diminished or impaired. See Const 1963, art 9, § 24. As applied to any pension benefits that accrue after January 1, 2012, however, I do not believe that 2011 PA 38 would violate Const 1963, art 9, § 24.

# I. ACCRUED FINANCIAL BENEFITS

The first sentence of Const 1963, art 9, § 24 provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Therefore, the critical question is whether the tax exemption contained in the preamendment version of MCL 206.30(1)(f) constitutes an accrued financial benefit of a public pension plan or retirement system. If the answer is affirmative, then the tax exemption is a contractual obligation that may not be diminished or impaired.

I believe that the ratifiers of the 1963 Constitution intended the term "accrued financial benefit[]" to encompass statutory tax exemptions for public pensions. Rather than choosing a precisely limited term—such as "monetary payment" or "cash distribution"—the framers chose to include in article 9, § 24 the broader, generalized term "financial benefits." In *Musselman v Governor*, 448 Mich 503, 514; 533 NW2d 237 (1995), this Court explained that a general rule is broader than "a set of specific commands" and that a general rule "governs possibilities that could not have been anticipated at the time." Given that a general rule is intended to encompass possibilities that may not yet exist, the term "accrued financial benefits" is certainly broad enough to encompass statutory tax exemptions, some of which already existed when the 1963 Constitution was ratified.[1]

---

[1] Because the framers chose a broad, generalized term, I find irrelevant the majority opinion's assertion that there is some import to the constitutional silence regarding whether pension benefits can be taxed. Simply put, the term "financial benefit" is

2

Indeed, Michigan has a long history of exempting public pensions from taxation. Annuity payments to employees in city library employees' retirement systems have been exempt from all state, county, township, city, village, and school district taxes since the 1920s, and state employee pensions have been similarly exempt since 1943 under the State Employees' Retirement Act (SERA). See MCL 38.705; MCL 38.40. Because these public-pension exemptions were firmly in place long before the 1963 Constitution was ratified, the financial benefits they provided to covered employees would certainly have been known to the framers and the ratifiers. In 1969, the Legislature enacted 1969 PA 332, which amended § 30 of the Income Tax Act, MCL 206.30, and extended the state's longstanding tax exemptions to the benefits received from all public pension and retirement systems. See MCL 206.30(1)(f), as amended by 2009 PA 134.[2] Extending the tax exemption to all public employees provided an incentive that would attract much-needed professionals to critical jobs in public employment and partially compensated retirees for the comparatively lower compensation received during their years of service

---

intentionally broad enough to encompass far more than the monetary payments due to retirees at the time of distribution.

[2] Before the enactment of 2011 PA 38, MCL 206.30(1)(f) provided that the following were to be deducted from the adjusted gross income when computing state income taxes:

> (*i*) Retirement or pension benefits received from a federal public retirement system or from a public retirement system of or created by this state or a political subdivision of this state.

> (*ii*) Retirement or pension benefits received from a public retirement system of or created by another state or any of its political subdivisions if the income tax laws of the other state permit a similar deduction or exemption or a reciprocal deduction or exemption of a retirement or pension benefit received from a public retirement system of or created by this state or any of the political subdivisions of this state.

3

to the state. With this history in mind, I believe that the statutory tax exemptions for public pensions are well within the types of benefits to which the ratifiers intended to extend contractual protections.

Concluding that the right to the tax exemption at distribution is both a "financial benefit" and an "accrued benefit" is consistent with this historical background. Specifically, there is no dispute that the various tax exemptions for public pensions provide a financial benefit because they result in a greater net monetary payment to retirees. There is likewise no dispute that taxing pension benefits diminishes those payments because removing the exemption will result in a reduced net monetary payment to retirees.

Turning to the phrase "accrued benefit," the majority relies in large part on the definition in *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642; 698 NW2d 350 (2005), to hold that "[a] pension-tax exemption is not an 'accrued' benefit because it does not 'grow over time.'" *Ante* at 16, quoting *Studier*, 472 Mich at 654. In holding that health-care benefits were not accrued financial benefits, the *Studier* majority concluded that the "ratifiers of our Constitution would have commonly understood 'accrued' benefits to be benefits of the type that increase or grow over time—such as a pension payment or retirement allowance that increases in amount along with the number of years of service a public school employee has completed." *Studier*, 472 Mich at 654.

Although I do not take issue with the majority's recitation of the various dictionary definitions of "accrue," I do not see how these definitions mandate that the benefit must "increase or grow over time." *Id*. Indeed, not all the definitions the majority provides encompass the idea of accumulation over time. For example, the

4

quoted definitions of "accrue" include "to come into existence as an enforceable claim," "to vest as a right," and "to become a present and enforceable right or demand." *Ante* at 15 (citations and quotation marks omitted). None of these definitions requires accumulation over time. Instead, these definitions acknowledge that a right can accrue immediately.[3]

As I stated in my *Studier* dissent, "[t]he term 'accrued financial benefits' was meant to include benefits that an employee *had worked in reliance on and continued to work in reliance on*." *Studier*, 472 Mich at 676 (CAVANAGH, J., dissenting). Like the health-care benefits at issue in *Studier*, I believe that our public employees have "worked in reliance on and continued to work in reliance on" Michigan's contractual promise that their pension benefits—once accrued—would not be taxed by the state at the time of distribution. Given Michigan's longstanding exemptions for state employees and city librarians, I believe that this interpretation is well within the common understanding of the people at the time of ratification. See *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 570-571; 737 NW2d 476 (2007) (CAVANAGH, J., dissenting).

Regardless, I believe that the tax exemption for public pensions fits even the *Studier* majority's narrow interpretation of "accrued benefit," because the financial

---

[3] For example, if one deposits $100 into a bank account, the right to withdraw the $100 "accrues" or "vest[s] as a right" immediately, regardless of whether additional money is deposited into the account. The customer has an immediate, enforceable claim to withdraw the money. The only conditions imposed are those contained in the contract between the bank and the customer. Thus, if one deposits $100 into an account under the contractual promise that if the customer waits 10 years, the customer will be entitled to withdraw $150—free of any additional costs or fees—then the right to withdraw that amount in 10 years vests at the point of the original deposit.

5

benefit provided by what is essentially a deferred tax exemption *does* "increase or grow over time." Specifically, the increase in the value of the tax exemption correlates precisely to the increase in the value of the employee's retirement account. As the value of an employee's retirement account grows over time, so too does the amount of money that will be exempt from taxation upon distribution, resulting in a financial benefit that increases with one's length of service to the public employer. Thus, I believe that the tax exemptions at issue here fit even the *Studier* majority's narrow definition.

In my view, the financial benefits of a pension plan—including any right to a tax exemption at distribution—accrue as an employee performs work for the public employer. See comments of Delegate Richard Van Dusen, 1 Official Record, Constitutional Convention 1961, p 771) ("And with respect to work performed, it is the opinion of the committee that the public employee should have a contractual right to benefits of the pension plan, which should not be diminished by the employing unit after the service has been performed."); *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659, 663; 209 NW2d 200 (1973) (holding that "the Legislature cannot diminish or impair accrued financial benefits, but we think it may properly attach new conditions for earning financial benefits which have not yet accrued"). And because prior to January 1, 2012, the financial benefits of public pension plans accrued under a statutory framework that exempted those benefits from taxation at distribution, I believe that the right to the tax exemption attaches to the benefits themselves—as they are earned—and accrues simultaneously.

Thus, while I agree that one generally cannot have any vested right in the continuation of any tax law, *Detroit v Walker*, 445 Mich 682, 703; 520 NW2d 135

6

(1994), this is not true if the Constitution provides otherwise, see *Shivel v Kent Co Treasurer*, 295 Mich 10, 15; 294 NW 78 (1940). I believe that article 9, § 24 provides otherwise. As I have explained, the Legislature is free to amend the tax exemptions, and indeed has seen fit to do so with 2011 PA 38 and similar acts. Accordingly, because article 9, § 24 protects the pension benefits that have already accrued from diminishment or impairment, and because I believe that the right to the tax exemption at distribution is essentially a deferred tax exemption that accrues simultaneously with the benefits themselves, I do not believe it is constitutional for the state to tax any pension benefits that will have accrued before January 1, 2012.

In contrast to the majority, I do not perceive any conflict with Const 1963, art 9, § 2, which provides that "[t]he *power of taxation* shall never be surrendered, suspended or contracted away." (Emphasis added.) The key phrase in article 9, § 2 is "power of taxation," which is a far different concept from actual taxation. In *W A Foote Mem Hosp, Inc v City of Jackson Hosp Auth*, 390 Mich 193; 211 NW2d 649 (1973), this Court concluded that article 9, § 2 was not violated when the Legislature chose to grant a tax exemption. *Id.* at 214-215. This Court held that rather than surrendering its power of taxation by granting the exemption, the Legislature was affirmatively exercising its taxation power and discretion. *Id.* at 215. Likewise, in enacting MCL 206.30(1)(f), the Legislature again exercised its discretion by creating a tax exemption, but did not forever surrender its power to tax. The import of article 9, § 2, of course, is that the Legislature can repeal or amend the tax exemption created by MCL 206.30(1)(f), as it has chosen to do in 2011 PA 38. And while the Legislature may properly tax any pension benefits that

7

accrue after January 1, 2012, when 2011 PA 38 goes into effect, in my view, article 9, § 24 protects from taxation any pension benefits that will have already accrued.

I also find it unavailing for the majority to argue that the second sentence of article 9, § 24 supports the majority's conclusion that § 24 was never meant to include a tax exemption because a tax exemption cannot be funded yearly. As the convention comments indicate, the second sentence of § 24 was intended to ensure the annual funding of pension liabilities. See 2 Constitutional Convention 1961, Official Record, p 2659. A tax exemption is not a liability. A tax exemption does not represent money the state must pay out; it only limits what the state may take in. Offering a tax exemption as a financial benefit for its employees allows the state to attract and retain talented and dedicated employees without incurring any yearly funding obligation for the benefit given. Therefore, the second sentence of § 24 is irrelevant to whether a tax exemption is encompassed within the meaning of "accrued financial benefits."[4]

In addition, it is well established that "an advisory opinion does not constitute a decision of the Court and is not precedentially binding in the same sense as a decision of the Court after a hearing on the merits." *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 461 n 1; 208 NW2d 469 (1973). With this premise in mind, I

---

[4] The majority opinion's claim that my analysis proves inconsistent is premised on the majority's tautological assumption that *only* those benefits that are capable of being funded annually qualify as accrued financial benefits under article 9, § 24. The correctness of the majority's accusation of inconsistency rests on its conclusion that the second sentence of article 9, § 24 is indispensible to the definition of "accrued financial benefits." The majority obfuscates my point, however, which is that the second sentence of article 9, § 24 is irrelevant to tax exemptions because, while a tax exemption *is* an accrued financial benefit, it is not a liability that can be funded annually.

believe the majority opinion sweeps far too wide in attempting to foreclose the myriad possible challenges premised on individual factual circumstances. For example, how does the removal of the tax exemption affect collective-bargaining agreements, in which the rate of future pension benefits was calculated, at least in part, in reliance on Michigan's longstanding exemption for pension benefits? As Justice LEVIN cautioned in a previous advisory opinion, "[w]hen a court holds an act to be constitutional it does no more than deny a particular claim of unconstitutionality. It ought not, by premature expressions on generalized abstract claims, to appear to foreclose persons differently situated from advancing more concrete claims of unconstitutionality." *Id*. at 484 (LEVIN, J., concurring). Footnote 9 of the majority opinion does just that: it attempts to foreclose differently situated persons from advancing concrete claims, and it does so with "premature expressions on generalized abstract claims."

Likewise, I believe the majority opinion reaches too far by attempting to foreclose future challenges to the Legislature's revocations of the individual exemptions contained in SERA, MCL 38.40(1); the Public School Employees Retirement Act, MCL 38.1346(1); the Michigan Legislative Retirement System Act, MCL 38.1057(1); the city library employees' retirement system act, MCL 38.705; and the Judges Retirement Act, MCL 38.2670(1).[5] In my view, the existence of these specific tax exemptions for public

---

[5] All these provisions have been amended to remove the exemptions, beginning January 1, 2012. See Public Acts 41 through 45 of 2011. Notably, the Governor did not request that this Court review the constitutionality of these other statutory amendments. Nevertheless, my view that the statutory tax exemption within the Income Tax Act creates accrued financial benefits for purposes of article 9, § 24 applies equally to the tax exemptions found within these retirement acts.

employees within the individual retirement acts themselves creates a strong argument that, under article 9, § 24, the exemptions are part of "each pension plan [or] retirement system," independent of the Income Tax Act.[6]

I think it important to emphasize that until the current fiscal crisis, the state of Michigan was perfectly content to receive the reciprocal benefits of the promise made to its prospective and current employees that, should they continue in service to the state

---

[6] For example, before the amendments contained in 2011 PA 41, § 40 of SERA provided in relevant part:

> The right of a person to a pension, an annuity, a retirement allowance, any optional benefit, *any other right accrued or accruing to any person under the provisions of this act*, the various funds created by this act, and all money and investments and income of the funds, are exempt from any state, county, municipal, or other local tax. [MCL 38.40(1), as amended by 2002 PA 99 (emphasis added).]

In my view, there is a strong argument that the tax exemption provided by SERA is an inherent part of the deferred compensation embodied in pension plan. Nevertheless, given my belief that the tax exemptions are "contractual obligations" under Const 1963, art 9, § 24, it is not necessary to opine on whether the tax exemption statutes found within the individual retirement acts—such as the tax exemption previously found within SERA—create contractual obligations for purposes of the Contracts Clause, as have other jurisdictions. See, e.g., *Hughes v Oregon*, 314 Or 1, 21 n 27; 838 P2d 1018 (1992). Further, because I conclude that 2011 PA 38 violates article 9, § 24 of the Constitution, I do not find it necessary to conclusively opine on whether the statutory amendments also violate the Contracts Clauses of the Michigan and United States Constitutions. Nevertheless, it briefly bears mentioning that there is an arguable Contracts Clause violation in this case. Because I believe that the statutory tax exemptions are accrued financial benefits under article 9, § 24, these benefits are "contractual obligations" that implicate the Contracts Clauses. Accordingly, under the framework for Contracts Clause analyses set forth in *Romein v Gen Motors Corp*, 436 Mich 515, 534-536; 462 NW2d 555 (1990), it is arguable that the modifications of the tax exemption statutes will amount to a substantial impairment of that contractual right. See *Bailey v North Carolina*, 348 NC 130, 151; 500 SE2d 54 (1998). Finally, even if there is a legitimate purpose behind the statutory amendments, I question whether violating article 9, § 24 of the Constitution is a reasonable means of carrying out that purpose.

long enough to be eligible for retirement, they would be rewarded with a tax exemption for the retirement benefits they had earned.  Only now do our state employees and retirees learn that their reliance on Michigan's promise was unfounded, and today's majority decision affixes a judicial stamp of approval to the revocation of that promise.  Between MCL 206.30(1)(f) and article 9, § 24, the state of Michigan entered into a contract with its employees, promising that in return for their years of service, their pensions would not be taxed.  Promises must be kept.

I, therefore, respectfully dissent from the majority's decision because I believe that Const 1963, art 9, § 24, requires the state to keep its promise.  I would hold that 2011 PA 38 is unconstitutional as applied to any pension benefits that will have accrued before January 1, 2012.

## II.  CONCLUSION

I respectfully dissent from the majority's conclusion that 2011 PA 38 does not violate Const 1963, art 9, § 24.  In my view, removing the tax exemptions formerly provided by MCL 206.30(1)(f) and similar statutes violates article 9, § 24, but only as applied to any public-pension benefits that will have accrued before January 1, 2012, when the new law goes into effect.  As to pension benefits that accrue after January 1, 2012, taxation of those benefits must be limited as stated in part III(D) of the majority opinion, because I agree with the majority that 2011 PA 38 violates the prohibition against a graduated income tax under Const 1963, art 9, § 7.

Michael F. Cavanagh
Marilyn Kelly

11

STATE OF MICHIGAN

SUPREME COURT

*In re* REQUEST FOR ADVISORY
OPINION REGARDING
CONSTITUTIONALITY OF 2011 PA 38                    No. 143157

_____

HATHAWAY, J. (*dissenting*).

I dissent from the majority's decision in this matter because the majority allows

unconstitutional limitations on retirement-based income-tax deductions to remain in place

and engages in policymaking decisions that should properly be left to the Legislature and

the Governor. The majority not only fails to strike down provisions of 2011 PA 38[1] that

are clearly unconstitutional, but also redrafts a section of this act to provide tax

deductions and exemptions that the Legislature clearly did not intend. I would hold that

the restrictions on the deductions of retirement income, as well as the income-based

restrictions on personal exemptions, enacted by 2011 PA 38 are unconstitutional. The

restrictions on deductions of retirement benefits contained in § 30(9) of the Income Tax

Act, MCL 206.30(9), as amended by 2011 PA 38, clearly violate article 9, § 24; article 1,

§ 10; and article 9, § 7 of Michigan's Constitution. The income-based restrictions on

personal exemptions contained in § 30(7) of that act, as amended by 2011 PA 38, clearly

violate article 9, § 7 of the Michigan Constitution. Moreover, I would follow the

---

[1] Section 30(9) of the Income Tax Act, as amended by 2011 PA 38, is focused on "deductions" against retirees' income. Section 30(7) is focused on "exemptions" with regard to the income of all taxpayers who qualify for the personal exemption under § 30(2).

established rules of statutory construction and refrain from judicially creating tax deductions and exemptions for individuals earning more than $75,000 annually and couples earning more than $150,000 annually, which the Legislature clearly did not intend.[2]  I would leave to the Legislature the important role of deciding the best tax policy for the citizens of this state and limit the judiciary to its proper role of reviewing statutes to determine whether they are in accordance with our Constitution.  Because the majority usurps this important legislative function in its decision today, I dissent.

## I.  ANALYSIS

On May 25, 2011, the Governor of Michigan signed 2011 PA 38 into law.  Among the various changes to the tax code enacted in 2011 PA 38 is a sliding scale for limitations on deductions of retirement income based on age and income level.  The act also imposes a sliding scale for limitations on income exemptions based on income level.  Opponents of the act argue that these changes violate the United States and Michigan Constitutions, while supporters of the act contend that its provisions are consistent with the Legislature's power to tax.

---

[2] It is clear from the language of 2011 PA 38 that the Legislature did not intend to extend deductions or exemptions to individuals and couples with higher incomes.  The Legislature specifically did not extend the deductions at issue to individuals earning more than $75,000 and couples earning more than $150,000 annually.  The Legislature similarly limited personal exemptions for individuals earning between $75,000 and $100,000 and for couples earning between $150,000 and $200,000.  Further, the Legislature specifically prohibited individuals earning more than $100,000 and couples earning more than $200,000 from claiming any personal exemptions.  Despite this legislative intent, the majority provides such deductions and exemptions.

2

On May 31, 2011, the Governor asked this Court to render an advisory opinion on issues pertaining to whether certain provisions of 2011 PA 38 are constitutional.[3] The specific inquiries raised by the Governor were (1) whether reducing or eliminating the statutory exemption for public-pension incomes as described in MCL 206.30, as amended, impairs accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24; (2) whether reducing or eliminating the statutory tax exemption for pension incomes as described in MCL 206.30, as amended, impairs a contractual obligation in violation of Const 1963, art 1, § 10 or US Const, art I, § 10(1); (3) whether determining eligibility for income-tax exemptions on the basis of total household resources, or age and total household resources as described in MCL 206.30(7) and (9), as amended, creates a graduated income tax in violation of Const 1963, art 9, § 7; and (4) whether determining eligibility for income-tax exemptions on the basis of date of birth as described in MCL 206.30(9), as amended, violates equal protection of the law under Const 1963, art 1, § 2 or the Fourteenth Amendment of the United States Constitution.[4]

---

[3] At the time the Governor asked this Court for an advisory opinion, 2011 PA 38 was still referred to by its public act number. It went into effect on October 1, 2011, and the provisions of 2011 PA 38 are now referred to by their statutory numbers, e.g., MCL 206.30. Accordingly, I will refer to the provisions at issue by their statutory numbers in the remainder of this opinion. Unless otherwise noted, all references to those statutes are to the amended versions.

[4] As to the fourth question posed by the Governor, I am not persuaded that the provision of the act basing tax liability on age violates equal-protection guarantees. However, because I conclude that the provision is unconstitutional for other reasons, I will not address the equal-protection issue in detail in this opinion.

3

This Court agreed to hear oral argument on the Governor's questions and requested that the Attorney General provide briefing in support of and in opposition to the constitutionality of the statutory sections at issue. *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 489 Mich 954 (2011).

## A.  MCL 206.30(9) VIOLATES ARTICLE 9, § 24 OF THE MICHIGAN CONSTITUTION

The first issue is whether reducing or eliminating the statutory deduction for public-pension income as described in MCL 206.30 impairs accrued financial benefits of a "pension plan [or] retirement system of the state [or] its political subdivisions" under Const 1963, art 9, § 24.  I conclude that it clearly does.

The starting point for this analysis is the language of article 9, § 24, which protects accrued retirement benefits of public employees.[5]  Const 1963, art 9, § 24 provides, in part: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."  Pursuant to this constitutional provision, accrued financial benefits of public-pension and retirement systems *shall not be diminished or impaired*.  This constitutional provision was ratified by the citizens of the state of Michigan and represents the will of the voters.  Article 9, § 24 is not discretionary; it is a mandatory provision of our state Constitution that the Legislature is bound to follow.  Moreover, the judiciary is bound to abide by this provision in determining whether a legislative enactment withstands constitutional scrutiny.

---

[5] See *Tyler v Livonia Pub Sch*, 459 Mich 382, 396; 590 NW2d 560 (1999).

4

Before the enactment of the current version of MCL 206.30,[6] the prior version of

MCL 206.30(1)(f)(*i*)[7] unequivocally provided that public pensions are not subject to state

---

[6] The current version of MCL 206.30(1)(f) provides in pertinent part:

> Deduct the following to the extent included in adjusted gross income subject to the limitations and restrictions set forth in [MCL 206.30(9)]:

> (*i*) Retirement or pension benefits received from a federal public retirement system or from a public retirement system of or created by this state or a political subdivision of this state.

> (*ii*) Retirement or pension benefits received from a public retirement system of or created by another state or any of its political subdivisions if the income tax laws of the other state permit a similar deduction or exemption or a reciprocal deduction or exemption of a retirement or pension benefit received from a public retirement system of or created by this state or any of the political subdivisions of this state.

> \* \* \*

> (*iv*) Beginning on and after January 1, 2007, retirement or pension benefits not deductible under [MCL 206.30(1)(f)(*i*)] or [MCL 206.30(1)(e)] from any other retirement or pension system or benefits from a retirement annuity policy in which payments are made for life to a senior citizen, to a maximum of $42,240.00 for a single return and $84,480.00 for a joint return. The maximum amounts allowed under this subparagraph shall be reduced by the amount of the deduction for retirement or pension benefits claimed under [MCL 206.30(1)(f)(*i*)] or [MCL 206.30(1)(e)] and by the amount of a deduction claimed under subdivision [MCL 206.30(1)(p)]. For the 2008 tax year and each tax year after 2008, the maximum amounts allowed under this subparagraph shall be adjusted by the percentage increase in the United States consumer price index for the immediately preceding calendar year. The department shall annualize the amounts provided in this subparagraph as necessary. As used in this subparagraph, "senior citizen" means that term as defined in [MCL 206.514].

[7] The previous version of MCL 206.30(1)(f)(*i*), as amended by 2009 PA 134, set forth unrestricted deductions for "[r]etirement or pension benefits received from a federal public retirement system or from a public retirement system of or created by this state or a political subdivision of this state."

income tax. At issue is whether MCL 206.30(9), which now abrogates the protection of public-pension benefits for individuals born in or after 1946[8] and imposes a tax on payments of public-pension benefits, is consistent with the Constitution. Subsection (9) provides:

> In determining taxable income under this section, the following limitations and restrictions apply:
>
> (a) For a person born before 1946, this subsection provides no additional restrictions or limitations under [MCL 206.30(1)(f)].
>
> (b) For a person born in 1946 through 1952, the sum of the deductions under [MCL 206.30(1)(f)(*i*), (*ii*), and (*iv*)] is limited to $20,000.00 for a single return and $40,000.00 for a joint return. After that person reaches the age of 67, the deductions under [MCL 206.30(1)(f)(*i*), (*ii*), and (*iv*)] do not apply and that person is eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return, which deduction is available against all types of income and is not restricted to income from retirement or pension benefits. However if that person's total household resources exceed $75,000.00 for a single return or $150,000.00 for a joint return, that person is not eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return. A person that takes the deduction under [MCL 206.30(1)(e)] is not eligible for the unrestricted deduction of $20,000.00 for a single return and $40,000.00 for a joint return under this subdivision.
>
> (c) For a person born after 1952, the deduction under [MCL 206.30(1)(f)(*i*), (*ii*), or (*iv*)] does not apply. When that person reaches the age of 67, that person is eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return, which deduction is available against all types of income and is not restricted to income from retirement or pension benefits. If a person takes the deduction of $20,000.00 for a single return and $40,000.00 for a joint return, that person shall not take the

---

[8] While this first issue discusses public pensions only, MCL 206.30(9) does not distinguish between private and public pensions. Because I would hold that subsection (9) is unconstitutional, I would conclude that the restrictions contained therein are not applicable to any retiree.

6

deduction under [MCL 206.30(1)(f)(*iii*)] and shall not take the personal exemption under [MCL 206.30(2)]. That person may elect not to take the deduction of $20,000.00 for a single return and $40,000.00 for a joint return and elect to take the deduction under [MCL 206.30(1)(f)(*iii*)] and the personal exemption under [MCL 206.30(2)] if that election would reduce that person's tax liability. However, if that person's total household resources exceed $75,000.00 for a single return or $150,000.00 for a joint return, that person is not eligible for a deduction of $20,000.00 for a single return and $40,000.00 for a joint return. A person that takes the deduction under [MCL 206.30(1)(e)] is not eligible for the unrestricted deduction of $20,000.00 for a single return and $40,000.00 for a joint return under this subdivision.

(d) For a joint return, the limitations and restrictions in this subsection shall be applied based on the age of the older spouse filing the joint return. [MCL 206.30(9).]

In reviewing this statute, we must examine the language of the statute itself, and the effect or impact of this new tax on the benefits received by public employees born in or after 1946, to determine whether "accrued financial benefits" are "impaired or diminished." This statute, without question, imposes a new tax on public-employee pensions that did not previously exist. It does so by restricting and limiting the pension and retirement deductions set forth in MCL 206.30(1)(f) on the basis of age and income level. These restrictions and limitations create various degrees of tax liability.

It is undisputed that public-employee pensions and retirement plans are an "accrued financial benefit" for purposes of article 9, § 24. As stated in *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 654; 698 NW2d 350 (2005), "the ratifiers of our Constitution would have commonly understood 'accrued' benefits to be benefits of the type that increase or grow over time—such as a pension payment or retirement allowance that increases in amount along with the number of years of service [an] employee has completed." Accordingly, MCL 206.30(9) clearly implicates an

7

accrued financial benefit. The inquiry then becomes whether that accrued financial benefit is diminished or impaired by the imposition of a state tax directly on that pension.

In analyzing this issue, the effect or impact the provision will have on public pensions cannot be ignored. MCL 206.30(9) has no impact on public pensions for those persons born before 1946. However, all persons entitled to receive public pensions born in or after 1946 will be directly impacted. These public employees with vested pensions will have their benefits reduced. This is a direct financial impact. For example, before the enactment of MCL 206.30(9), a retiree born after 1952 who earned annual public-pension benefits of $20,000 would receive the full $20,000 annually. Under MCL 206.30(9), however, that retiree's $20,000 pension is no longer deductible. That $20,000 is subject to the state's 4.35 percent income tax rate, which results in an $875 reduction in the total amount of money that the retiree will receive annually. This is a direct tax on a public pension that will in most instances be deducted directly from the pension benefit at the time of distribution. This results in a financial reduction in the benefit to the pension recipient. A financial reduction of a benefit is a diminishment or impairment under any definition.[9] Thus, a direct tax on public pensions contravenes the constitutional prohibition contained in article 9, § 24. Specifically, by diminishing the vested pension

---

[9] "Diminish" is defined as "to make, or make seem, smaller; reduce in size, degree, importance, etc.; lessen," *Webster's New World College Dictionary* (1988), or "to lessen; decrease," *Random House Webster's College Dictionary* (1997). "Impair" is defined as "to make worse, less, weaker, etc.; damage; reduce." *Webster's New World College Dictionary* (1988).

8

and retirement benefits of public employees, MCL 206.30(9) violates the constitutional mandate that such benefits "shall not be diminished."[10]

The majority opines that MCL 206.30(9) only reduces or eliminates tax deductions based on retirement and pension benefits and does not directly reduce the benefits themselves. The majority reasons that "tax deductions" do not amount to an accrued financial benefit and, therefore, the deductions do not fall within the purview of article 9, § 24. I find the majority's reasoning unpersuasive and erroneous because it creates an unnecessary distinction. Simply stated, a tax is a tax, whether it comes in the form of a direct tax increase or the elimination of a deduction. The elimination of this tax deduction results in a new tax, which is directly imposed on vested pensions. The pension benefits are irrefutably "accrued financial benefits." The majority disregards this. The majority also disregards the fact that the payout of pension benefits is reduced. But the impact remains the same: pension benefits, which are accrued financial benefits, will be diminished or impaired because they will be directly reduced by this tax. As former Attorney General Frank Kelley correctly stated in an opinion of the Attorney General:

> [T]here is little question that an exemption from taxation for pension benefits constitutes "financial benefits" within the meaning of Const 1963, art 9, § 24, since the exemption usually will result in greater net pension

---

[10] The majority asserts that I do not recognize the distinction between pension benefits and tax deductions. I do recognize that there is a distinction; however, that distinction is not the relevant inquiry in this matter. The relevant inquiry under article 9, § 24 is whether accrued financial benefits are diminished. It is the majority that disregards that reducing or eliminating tax deductions results in the diminishment of pension benefits, which are accrued financial benefits.

payments for the recipient. In Robert Tilove's treatise, *Public Employee Pension Funds* (1976), *cited with approval* by Justice Williams for the unanimous Court in *Kosa v State Treasurer*, 408 Mich 356, 372 n 22; see also pp 372-373; 292 NW2d 452 (1980), the author, Tilove, in referring to public pension income tax exemptions generally, states: "[a]n income tax exemption has precisely the same effect as a benefit." (At p 244.) [OAG, 1991-1992, No 6697, p 119 (December 18, 1991).]

The public-pension tax exemptions themselves have become part of the accrued financial benefits for vested employees, and reducing or eliminating them violates the Constitution.[11] Therefore, under article 9, § 24, the Legislature cannot circumvent the prohibition against reducing accrued financial benefits by reducing or eliminating tax deductions unless it replaces the loss of benefits caused by the reduction or elimination of the deductions. The result of cutting the deduction for benefits is the same as directly cutting the benefits themselves, and it is unconstitutional. The Legislature cannot do indirectly what the Constitution directly prohibits.

## B. MCL 206.30(9) VIOLATES ARTICLE 1, § 10 OF MICHIGAN'S CONSTITUTION

The next issue is whether reducing or eliminating the statutory deduction for vested public-pension income as described in MCL 206.30 results in a "law impairing the obligation of contract" under article 1, § 10 of the Michigan Constitution. I conclude that it does.

Const 1963, art 9, § 24 specifies that accrued financial benefits of public-retirement and pension plans are constitutionally mandated and protected "contractual

---

[11] This is true because the tax exemptions are directly tied to pension income that is vested and is being paid to retirees. If this were a sales tax or some other form of tax not directly tied to a constitutionally protected form of income, we would be faced with different issues.

10

obligation[s] . . . ." Const 1963, art 1, § 10 provides that "[n]o bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." Stated plainly, article 9, § 24 creates an undiminishable, unimpairable contractual obligation with regard to accrued financial benefits of retirement income, and article 1, § 10 prohibits the Legislature from passing laws that impair contractual obligations. Therefore, if a statutory provision reduces the constitutionally afforded contractual obligations surrounding accrued financial benefits of retirement income, that statutory provision violates these constitutional provisions.

As explained in the discussion of the previous issue, MCL 206.30(9) reduces the accrued financial benefits of public retirement and pension plans. By reducing the amount of benefits that public employees receive as part of the contractual obligation owed them by public entities, MCL 206.30(9) impairs that contractual obligation. Thus, the reduction of such benefits violates the constitutional protections afforded to contractual obligations and must be struck down.

### C. MCL 206.30(7) AND (9) VIOLATE ARTICLE 9, § 7 OF MICHIGAN'S CONSTITUTION

The third issue before us is whether the income-based criteria for determining tax liability in MCL 206.30 create a graduated income tax in violation of article 9, § 7 of Michigan's Constitution. Like the majority, I conclude that they do.

Article 9, § 7 of Michigan's Constitution prohibits a graduated income tax. That provision states: "No income tax graduated as to rate or base shall be imposed by the state or any of its subdivisions." This Court has previously stated that article 9, § 7 was

11

designed to prohibit a graduated income-tax system that is similar to the federal tax system, in which tax rates increase as income increases. *Kuhn v Dep't of Treasury*, 384 Mich 378, 389; 183 NW2d 796 (1971). The income-based criteria contained in sections MCL 206.30(7) and (9),[12] which increase tax liability for higher levels of income, are

---

[12] MCL 206.30(7) provides:

> For each tax year beginning on and after January 1, 2013, the personal exemption allowed under subsection [MCL 206.30(2)] shall be adjusted by multiplying the exemption for the tax year beginning in 2012 by a fraction, the numerator of which is the United States consumer price index for the state fiscal year ending in the tax year prior to the tax year for which the adjustment is being made and the denominator of which is the United States consumer price index for the 2010-2011 state fiscal year. The resultant product shall be rounded to the nearest $100.00 increment. As used in this section, "United States consumer price index" means the United States consumer price index for all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics. For each tax year, the exemptions allowed under [MCL 206.30(3)] shall be adjusted by multiplying the exemption amount under [MCL 206.30(3)] for the tax year by a fraction, the numerator of which is the United States consumer price index for the state fiscal year ending the tax year prior to the tax year for which the adjustment is being made and the denominator of which is the United States consumer price index for the 1998-1999 state fiscal year. The resultant product shall be rounded to the nearest $100.00 increment. For a taxpayer whose total household resources are $75,000.00 or more for a single return or $150,000.00 or more for a joint return, the personal exemption allowed under [MCL 206.30(2)] shall be adjusted by multiplying the exemption for the tax year for a single return by a fraction, the numerator of which is $100,000.00 minus the taxpayer's total household resources, and the denominator of which is $25,000.00, and for a joint return by a fraction, the numerator of which is $200,000.00 minus the taxpayer's total household resources, and the denominator of which is $50,000.00. The personal exemption allowed under [MCL 206.30(2)] shall not be allowed for a single taxpayer whose total household resources exceed $100,000.00 or for joint filers whose total household resources exceed $200,000.00.

unconstitutional. Such criteria create a graduated income tax that effectively increases the tax rate on the basis of a taxpayer's income.

The supporters of MCL 206.30 argue that it does not directly create higher tax rates for higher levels of income because the tax rate remains flat at 4.35 percent. The supporters argue that it is irrelevant whether the effective tax rate increases as "household resources"—meaning income—increase, as long as the 4.35 percent tax rate remains intact. However, the argument that MCL 206.30 is constitutional because it does not *directly* do what the Constitution prohibits is unpersuasive. In *Butcher v Dep't of Treasury*, 425 Mich 262, 273; 389 NW2d 412 (1986), this Court stated:

> It is clear that in *Kuhn*, by closely examining the credits, exclusions, and exemptions there challenged, we at least implied that a constitutional violation can occur by the use of income criteria for determining their amounts. The *reduction* of a credit . . . would be no exception to such an implication, if . . . it was determined that such a reduction was influenced by income bracketing, and such factors affected the income tax liability.

While the income-based criteria in MCL 206.30(7) and (9) do not directly increase the tax rate or base proportional to income level, the effect of imposing those criteria is to create a graduated tax rate tied to income level.

For example, consider two single retirees born after 1952 who have reached the age of 67. Retiree A earns $100,000 a year, and Retiree B earns $50,000 a year. Under MCL 206.30(9), Retiree A is not entitled to a $20,000 deduction in taxable income because he or she makes more than $75,000, while Retiree B makes less than $75,000 and is entitled to the deduction. Thus, Retiree B only pays taxes on $30,000 of taxable income. With a tax rate of 4.35 percent on taxable income, Retiree A pays $4,350 in taxes, which is an effective rate of 4.35 percent on $100,000. Meanwhile, Retiree B pays

13

$1,305 in taxes, which is an effective rate of 2.61 percent on $50,000. The result is a graduated tax rate based on level of income. The same calculations produce similar results for the income-based reduction and elimination of personal exemptions for all taxpayers found in MCL 206.30(7). All income-based criteria for limiting and restricting taxable income using income brackets are unconstitutional.

Accordingly, I would hold that both MCL 206.30(7) and (9) are unconstitutional.

## D. THE MAJORITY'S RESOLUTION

The final issue is one created by the majority's perplexing resolution of this case, in light of its holding that MCL 206.30(7) and (9) violate the Constitution. I agree with the majority that the income-based factors in subsections (7) and (9) unconstitutionally create a graduated income tax. However, I disagree with the troubling method that the majority has chosen to resolve the Governor's questions with regard to the constitutionality of those subsections. Rather than striking down those subsections, the majority carves out the sentences from subsections (7) and (9) that limit personal exemptions and deductions on the basis of income.[13] In doing so, the majority has created entirely different laws than those passed by the Legislature and signed by the Governor. Specifically, the majority provides judicially created tax exemptions and deductions, despite the fact that the Legislature did not provide such tax breaks. The majority's decision changes the tax code and now allows individuals earning more than $75,000 annually, and couples earning more than $150,000 annually, to have their tax liability reduced. This is the opposite of what the Legislature intended.

---

[13] For the majority's new tax policies, see *ante* at 47-49.

14

The majority claims that it is simply severing the unconstitutional portions from the statute. However, the statutory rules of severability do not permit such an outcome. Those rules are contained in MCL 8.5, which provides:

> In the construction of the statutes of this state the following rules shall be observed, *unless such construction would be inconsistent with the manifest intent of the legislature*, that is to say:

> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, *provided such remaining portions are not determined by the court to be inoperable*, and to this end acts are declared to be severable. [Emphasis added.]

Under these rules, this Court must consider whether an entire section has to be struck down or whether the unconstitutional portions of that section can be severed from the remainder of the statute. Unconstitutional language can be severed when "the remaining portions are not determined by the court to be inoperable . . . ."[14] However, that only applies if the remaining portion of the statute is not "inconsistent with the manifest intent of the legislature . . . ."[15]

In this matter, the majority attempts to justify its result by stating that the Legislature was aware that portions of 2011 PA 38 could be held unconstitutional and that those portions could be severed to keep the rest of the act constitutional. The majority asserts that members of the Legislature would have known which words from

---

[14] MCL 8.5.

[15] *Id.*

15

each section it passed could be held unconstitutional. This is groundless guesswork by the majority.

Moreover, the majority attempts to justify its restructuring of sections MCL 206.30(7) and (9) by arguing that the Attorney General requested this remedy in the brief supporting the law. This argument overlooks a fundamental tenet of statutory analysis: the Court's primary obligation is to ascertain legislative intent.[16] The Legislature duly enacted this statute, and the Governor signed it into law. We have a clear indication of what the Legislature intended when it limited personal exemptions and deductions of retirement income: the actual language of the statute before us.[17] Given the language of MCL 206.30(7) and (9), it is indisputable that the Legislature intended to determine tax liability on the basis of factors such as age and income, and it is also indisputable that the Legislature chose not to grant exemptions and deductions to taxpayers in higher income brackets. Raising or lowering tax liability is a highly political undertaking in this state.

---

[16] *People v Hill*, 486 Mich 658, 667; 786 NW2d 601 (2010).

[17] In *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999), we stated:

> The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. *Murphy v Michigan Bell Telephone Co*, 447 Mich 93, 98; 523 NW2d 310 (1994). See also *Nation v W D E Electric Co*, 454 Mich 489, 494; 563 NW2d 233 (1997). This task begins by examining the language of the statute itself. The words of a statute provide "the most reliable evidence of its intent . . . ." *United States v Turkette*, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996).

The Legislature, for its own policy reasons, chose not to lower the tax liability of individuals earning more than $75,000 annually and couples earning more than $150,000 annually, and it incorporated language into MCL 206.30 to fulfill this intention. While that policy decision was unconstitutional, it is not the place of this Court to make tax policy choices for the Legislature by severing parts of the sections at issue. In so doing, the majority expands the exemptions and deductions contemplated by the Legislature. Such a result is clearly against the intent of the Legislature.

In this advisory matter, the Governor asked this Court to opine on whether MCL 206.30(7) and (9) are unconstitutional. Our proper role is to advise the Governor if either of these subsections violates the Constitution. Now that we have done so, it is up to the Legislature to determine whether the Income Tax Act should be redrafted—and, if so, how—in light of our ruling. Accordingly, I would follow the established rules of statutory construction and refrain from judicially creating deductions and exemptions that the Legislature clearly did not intend. I would leave to the Legislature the important role of deciding the best tax policy for the citizens of this state and limit the judiciary to its proper role of reviewing statutes to determine whether they are in accordance with our Constitution.

## II. CONCLUSION

I would hold that MCL 206.30(9) is unconstitutional because it clearly violates article 9, § 24; article 1, § 10; and article 9, § 7 of Michigan's Constitution. Furthermore, I would hold that MCL 206.30(7) is unconstitutional because it also clearly violates article 9, § 7 of Michigan's Constitution. The majority not only fails to strike down parts

17

of MCL 206.30 that are clearly unconstitutional, but also redrafts parts of this statute to provide tax exemptions and deductions that the Legislature clearly did not intend.

In sum, I would follow the established rules of statutory construction and refrain from judicially creating deductions and exemptions for individuals earning more than $75,000 annually and couples earning more than $150,000 annually, which the Legislature clearly did not intend. Moreover, I would leave to the Legislature the important role of deciding the best tax policy for the citizens of this state and properly limit the judiciary's role to reviewing statutes to determine whether they are in accordance with our Constitution. Because the majority usurps this important legislative function in its decision today, I dissent.

Diane M. Hathaway

18